OPINION
{¶ 1} Appellant, Gregory J. Mercer, appeals from a judgment of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch, overruling his objections to a magistrate's decision in which the magistrate found that appellant's two sons were abused, neglected and dependent children.
 {¶ 2} On June 3, 2002, Vunessa Allen, an employee with the Ohio Youth Advocate Program, filed a complaint alleging that Jay Mercer ("Jay"), age eleven, and Charles Mercer ("Charlie"), age nine, were abused children, pursuant to R.C. 2151.031(D), as well as neglected children, under R.C.2151.03(A)(2), and dependent children, as defined by R.C. 2151.04(C). The matter came for hearing before a magistrate, who issued a decision on August 22, 2002, finding that the boys were abused, neglected and dependent children.
 {¶ 3} On March 19, 2003, the magistrate issued findings of fact and conclusions of law, which included the following facts. On December 10, 2001, Christy Bobo-Burre, an intake worker with the Franklin County Children Services ("FCCS"), received a referral from a mandated reporter regarding the possible physical abuse of Jay and his brother Charlie, while in the care of their father, appellant.
 {¶ 4} Burre went to the boys' school, met with their principal, and then spoke with both Jay and Charlie. Burre observed that Jay had a red swollen eye, a long linear mark on his buttocks, and two horizontal linear marks on the back of his right leg. Charlie had similar marks, including linear marks on the side and back of his upper right leg, and bruising down the sides of his legs. Burre testified that the marks on Jay were more like a line (i.e., very straight, with sharp edges), while Charlie's marks were spread out, and more similar to bruising.
 {¶ 5} After Jay and Charlie returned to class, Burre phoned her supervisor and discussed the marks. Burre then called the police and arranged for the boys to be transported to her office at FCCS; later that evening, the boys were placed in foster care. Also that evening, Burre spoke with appellant regarding the allegations. Appellant acknowledged that the boys were spanked with a belt, but he denied leaving any marks. According to Burre, appellant was sarcastic and difficult to communicate with, and he stated that the boys were lying.
 {¶ 6} The next morning (December 11, 2001), Burre met with appellant and the boys' mother, Charlotte Hemmingway,[1] at Burre's office. During the meeting, appellant refused to sit down and would not allow Hemmingway to speak. When it became clear to Burre that the meeting would not be productive, she asked appellant to leave. Appellant maintained, however, that he did not leave marks on the boys and that he did not know anything about an injury to Jay's eye.
 {¶ 7} Several days later, appellant admitted to Burre that the boys probably did have marks and bruises. Appellant stated that Jay had tripped while playing football outside on the sidewalk; eventually, however, appellant admitted that he did leave welts and bruises on the boys' legs and buttocks due to the spanking with a belt. Burre further testified that, throughout her conversations with appellant, he kept referring to having been in the military and that it was his job to make sure his boys became productive citizens. He described his discipline methods as taking away privileges or requiring the boys to stand in corners; however, if one of the boys engaged in dangerous behavior, the discipline would be more intense.
 {¶ 8} During the state's case, appellant was called on cross-examination, and gave the following account of the events on December 8, 2001. On that date, he was upstairs at his residence, while the boys were playing downstairs. Appellant heard a crashing sound and went downstairs where he observed broken glass on the floor. The boys told him that they had been playing football and Jay had kicked an object into an artifact case, breaking the glass. Appellant told Jay to go upstairs and get a belt. Jay retrieved a belt, and appellant gave each boy three or four "whacks"; the boys were told to stand in the corner until appellant was done cleaning up the glass (approximately onehalf hour). Appellant stated that the "whacks" were to the boys' rear ends, not their backs; however, the boys may have been hit on the legs due to their dancing around. Appellant denied hitting the boys in the face. On December 11, 2001, the boys were placed with their mother.
 {¶ 9} Appellant also testified during his case-in-chief. He again related the above events, but added that, when he told Jay he was going to get the belt for the first time, Jay responded: "You can't. I'll call FCCS." Appellant further testified that, after the boys received three or four "whacks," they were placed in a corner for approximately 30 to 40 minutes.
 {¶ 10} Appellant explained that the three or four cracks of the belt were "the same as my old man gave me." When asked whether he thought the discipline was excessive, he responded, "[n]egative." According to appellant, Jay had previously told lies and had stolen. Appellant related that he tries to raise the boys in the military style, and described them as "my little troops." He also testified that, if the boys' teachers fail to give them homework, he makes up homework in order to keep them one and one-half years ahead in school.
 {¶ 11} Jay testified during the hearing about the incident at issue. Jay explained that he and his brother were playing football in the basement with a stuffed animal. Jay kicked the ball and it hit an artifact case, causing the case to fall to the ground and break. His father heard the sound of glass breaking and came downstairs; he walked by the boys, slapped Charlie in the face and then started whipping Jay, hitting him in the back and down the right leg with his hand. Charlie then retrieved a belt from upstairs and Jay got whipped with the belt. Jay and his brother were required to assume what he termed the "P.O.W. position," and it made him feel helpless, like a prisoner.
 {¶ 12} Jay testified that, prior to this incident, his father had whipped him with a belt on approximately five other occasions; however, the incident at issue was the first time he was hit somewhere other than his buttocks (i.e., on his back and right leg). Jay admitted telling others that his father did not hurt him even though he had, but Jay explained he did so because his father had threatened to take him and his brother away from their mother. Jay stated that he was fearful of his father because "he's strong and has the ability to hurt us and anybody else."
 {¶ 13} At the hearing, photographs were admitted depicting marks on the boys. Jay testified that the marks were the result of his father slapping him and whipping him with a belt.
 {¶ 14} Based upon the evidence presented, the magistrate concluded that the state had demonstrated, by clear and convincing evidence, that Jay and Charlie were abused, neglected and dependent children. At the hearing, the magistrate indicated that the mother would be awarded legal custody of the children with a protective supervision order to FCCS. The magistrate ordered appellant to attend anger management counseling and parenting classes, and further ordered that appellant's initial visits be supervised, setting an annual review within 90 days. The magistrate expressed a desire that, "as progress is made on the case plan, * * * dad's supervised status can be reduced to unsupervised [and] I'd like to see the point where we're back to a shared parenting * * * arrangement." (Tr. Aug. 22, 2002, at 36-37.)
 {¶ 15}
 {¶ 16} Appellant filed objections to the magistrate's decision. The trial court subsequently rendered a decision and entry, overruling appellant's objections to the magistrate's decision.
 {¶ 17} On appeal, appellant sets forth the following assignments of error:
1. The Court abused its discretion in adopting the Magistrate's findings of fact, conclusions of law and in upholding the Magistrate's decision.
2. The Court erred in finding the boys to be abused, neglected and dependent.
3. The Court erred in finding the testimony of Jay Mercer credible.
4. The Court erred in finding facts in the decision not in evidence or otherwise in the record.
5. The Court erred in finding Mr. Mercer unwilling to modify his parenting methods, to have unreasonable expectations of his children, and that there was escalating severity in punishment.
 {¶ 18} At the outset, we note that appellant has failed to argue each of his assignments of error separately in the brief, as required by App.R. 16(A)(7). While App.R. 12(A)(2) permits this court to disregard assignments of error not separately argued, in the interests of justice we will attempt to address the primary issues raised in his appellate brief, consolidating the arguments for review.
 {¶ 19} Appellant's primary contention is that the trial court erred in finding that Jay and Charlie were abused, neglected and dependent children. Pursuant to R.C. 2151.031(D), an "abused child" includes any child who, "[b]ecause of the acts of his parents, guardian, or custodian, suffers physical or mental injury that harms or threatens to harm the child's health or welfare." R.C. 2151.03(A)(2) defines a "neglected child" as one who "lacks adequate parental care because of the faults or habits of the child's parents, guardian, or custodian[.]" R.C.2151.04(C) defines a "dependent child" as one "[w]hose condition or environment is such as to warrant the state, in the interests of the child, in assuming the child's guardianship[.]"
 {¶ 20} In In the Matter of Horton, Franklin App. No. 03AP-1181,2004-Ohio-6249, at ¶ 11-12, this court discussed the applicable standards in reviewing cases involving a determination whether a child is abused, stating as follows:
That a child is an abused minor must be established by clear and convincing evidence. R.C. 2151.35(A). Clear and convincing evidence is that measure or degree of proof which is more than a mere preponderance of the evidence, but does not reach the extent of the certainty required to establish "beyond a reasonable doubt" in criminal cases. It is that quantum of evidence that will produce in the mind of the trier of fact a firm belief or conviction as to the facts sought to be established. Crossv. Ledford (1954), 161 Ohio St. 469, 53 Ohio O.O. 361, * * *120 N.E.2d 118.
When reviewing a trial court's decision on a manifest weight of the evidence basis, we are guided by the presumption that the findings of the trial court were correct. The weight to be given the evidence and the credibility of the witnesses are primarily for the trier of fact. Statev. DeHass (1967), 10 Ohio St.2d 230, 39 Ohio O.O.2d 366, * * *227 N.E.2d 212, paragraph one of the syllabus. The rationale for this presumption is that the trial court is in the best position to evaluate the evidence by viewing witnesses and observing their demeanor, voice inflections, and gestures. Seasons Coal Co. v. Cleveland (1984),10 Ohio St.3d 77, 10 OBR 408, 461 N.E.2d 1273. Accordingly, judgments which are supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence. C.E. Morris Co. v.Foley Constr. Co. (1978), 54 Ohio St.2d 279, 8 O.O.3d 261, 376 N.E.2d 578, syllabus.
 {¶ 21} Ohio law has long recognized the fact that parents have a right of restraint over their children, and the duty to correct and punish them for their misbehavior; however, such punishment must be reasonable, and must not exceed the bounds of moderation so as to inflict cruel punishment. Id., at ¶ 14, citing In re Schuerman (1991),74 Ohio App.3d 528, 531. Further, "[a]s the Revised Code does not specifically define what actions constitute abuse of a child, the trial court is to make its determination on a case-by-case basis, reviewing the totality of the circumstances." In re Wilson Children (Feb. 6, 1995), Stark App. No. 1994CA00161. Among the factors to be considered "include the circumstances giving rise to the harm to the child, the past history of the child, the nature and manner of the discipline administered, and the measure of discipline." Id.
 {¶ 22} As noted above, the magistrate's decision set forth in detail the testimony of various witnesses, including the intake worker and appellant, as well as Jay's account regarding bruises and linear marks purportedly left on him as a result of appellant striking him with a belt. According to Jay, when his father heard the sound of breaking glass and came downstairs, "he looked at us and he came by [and] slapped Charlie in the face." (Tr. Aug. 19, 2002, at 57.) Jay testified that his father "first * * * started whipping me and I felt — I got — I got hit in the back a couple times and down my right leg." (Tr. Aug. 19, 2002, at 58.) Appellant spanked Jay with both his hand and with a belt. Jay was ordered to go to a corner and assume a "Prisoner of War position." (Tr. Aug. 19, 2002, at 59.) He described this as being "on my knees, my hands behind back locked, * * * and my legs are crossed." (Tr. Aug. 19, 2002, at 60.) After he was in that position, he remembered "getting hit by the belt down my legs * * * [a]nd repeatedly on my back." (Tr. Aug. 19, 2002, at 60.) Jay did not say anything; he "just cried." (Tr. Aug. 19, 2002, at 61.) On prior occasions, Jay's father had disciplined him by making him assume this position, but Jay stated that "[n]ormally I'm just sittin' (sic) there but this time I wasn't, I was getting' (sic) hit." (Tr. Aug. 19, 2002, at 61.)
 {¶ 23} Here, there was undisputed evidence that the father struck the children multiple times with a belt. The magistrate found that appellant's actions were excessive, noting that both boys were "smacked and whipped with a belt * * * to the point where numerous bruises and marks were still apparent several days later." The boys' mother testified that the marks and bruising were visible for a week. Photographs taken shortly after the incident and admitted during the proceedings showed the presence of bruises and linear marks on the boys. As noted, according to the testimony of Jay, some of the blows were inflicted while he was required to remain in a "P.O.W. position," with his hands behind his back. Although appellant claimed that he was only trying to strike the children on their buttocks, he obviously missed the mark more than once, inflicting bruises and marks on their legs. In contrast to appellant's testimony that this was the first time he had used a belt to discipline the boys, Jay stated that his father had disciplined him with a belt on approximately five other occasions prior to this incident. Jay testified that he remained fearful of his father because "he's strong and has the ability to hurt us." The magistrate observed that, while Jay was disciplined for "putting Charlie in danger," it was not clear as to why he also whipped Charlie.
 {¶ 24} Based upon the testimony presented, the magistrate concluded that the actions of appellant, including his unreasonable expectations for the children, his escalating severity in imposing punishment, and his unwillingness to modify his parenting methods, caused Jay and Charlie injury that harmed or threatened their health or welfare. R.C. 2151.031(D). The trial court agreed, and further found in addressing appellant's argument that the conduct constituted reasonable corporate punishment that, although that exception was not applicable to the instant case, the actions of appellant exceeded the bounds of moderation and rose to the level of abuse "had the complaint been brought under R.C. 2151.031(C)."
 {¶ 25} Upon review, we find no error with the trial court's determination that the state presented clear and convincing evidence the children were abused. See, e.g., In re Wilson, supra (evidence, including admission that parent hit child on lower back with a belt, leaving marks on stomach and back, was sufficient to support court's finding that, because of parent's actions, child suffered physical injury that harmed or threatened to harm the child's health or welfare); State v. Miller
(Feb. 25, 2000), Hamilton App. No. C-990166 (evidence supported finding that defendant's actions, including bruises resulting from striking child with belt, constituted abuse, i.e., "any act which causes physical or mental injury that harms or threatens to harm the child's health or welfare"). Furthermore, the court in the instant case could have concluded, based upon the evidence presented, that Jay and Charlie lacked adequate parental care because of the faults and habits of the child's parents, and that the boys' condition or environment was such as to warrant state intervention to further the best interests of the children. See In re Surfer (May 7, 1998), Franklin App. No. 97APF09-1158 (under R.C. 2151.04(D), "court need find only that one sibling or other child has been abused in order to find dependency of the child at issue").
 {¶ 26} Appellant advances various reasons why the magistrate and trial court should have discounted the testimony of all of the witnesses except for that of appellant. However, credibility determinations, as well as the weight to be given the evidence, are matters primarily within the province of the trier of fact. State v. DeHass (1967), 10 Ohio St.2d 230, paragraph one of the syllabus. In the instant case, the trial court, in addressing appellant's objections, noted that the magistrate found the testimony of the intake worker and certain portions of Jay's testimony to be credible. The magistrate, while not accepting Jay's testimony regarding his eye injury, specifically found that Jay's testimony remained "consistent" throughout both direct and cross-examination, and found credible Jay's testimony that his father placed him and his brother in a "P.O.W. position." The marks and bruises on the boys, which remained visible some time after the incident, were consistent with Jay's version. Appellant, when first confronted by the FCCS worker, denied that he could have left marks or bruises with the spanking, but he later admitted that they could have been the result of his actions. Here, the trier of fact was in the best position to weigh the conflicting evidence and resolve issues of credibility, and we decline to disturb those determinations on appeal.
 {¶ 27} Appellant also challenges findings by the trial court that he raised his children in a military style. However, the record indicates that, during re-direct examination, appellant was asked whether he takes into consideration "military tradition" when he disciplines his children. Appellant discussed having family members who had served in the military, and stated he did not believe "those traditions are any different than the amount of self-discipline it requires one to come home after school, crack the books for an hour and learn something." (Tr. Aug. 19, 2002, at 12.) Appellant further stated, "I think the principles are the same. I like to refer to them [Jay and Charlie] as, `My little troops,' you betcha (sic). I love 'em (sic) just as much as I loved the guys who I had responsibility for in any of my positions as a NCO when I was in the military." (Tr. Aug. 19, 2002, at 12-13.) Thus, the record sets forth evidence supporting the trial court's findings on this issue.
 {¶ 28} Based upon the foregoing, appellant's five assignments of error are overruled, and the judgment of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch, is hereby affirmed.
Judgment affirmed.
Lazarus and Petree, JJ., concur.
[1] Appellant and Hemmingway were divorced in 1994.