[Cite as *In re G.C-O.*, 2013-Ohio-4974.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## SENECA COUNTY

IN RE:                                                    CASE NO. 13-12-56

    G.C-O.,

ALLEGED DEPENDENT CHILD.                    **O P I N I O N**

**Appeal from Seneca County Common Pleas Court**
**Juvenile Division**
**Trial Court No. 21250005**

**Judgment Reversed and Cause Remanded**

**Date of Decision:   November 12, 2013**

**APPEARANCES:**

    *Jennifer L. Kahler* **for Appellant**

    *Tiffany F. Hoyt* **for Appellee**

**WILLAMOWSKI, J.**

{¶1} Appellant William Omlor ("Omlor") brings this appeal from the judgment of the Court of Common Pleas of Seneca County, Juvenile Division adjudicating that his son is a dependent child. For the reasons set forth below, the judgment is reversed.

{¶2} On October 6, 2010, the minor child G.C-O. was born to Tonya Currier ("Currier") and Omlor. The two were not married, but had a relationship. Omlor was named the residential parent of G.C-O. on October 26, 2011, and Currier was granted visitation rights. On January 5, 2012, Omlor petitioned the Common Pleas Court of Seneca County for a civil protection order from Currier alleging that she had struck him during an argument. An *ex parte* civil protection order was granted that same day, however G.C-O. was not a person for whom protection was necessary or sought.

{¶3} On February 2, 2012, Currier went to Omlor's home to speak to him about their relationship. She brought her two children from a prior relationship, A.E. who was five years old at the time and J.E. who was four years old at the time, with her. Omlor and Currier spoke on the porch while G.C-O. was in the house sleeping. An argument resulted and Currier threatened to kill herself by placing a piece of glass to her neck and threatening to jump off the roof. Tr. 43.

Omlor then went into the home, leaving Currier on the front porch, and called the police to notify them of Currier's threats to harm herself.  Tr. 36

{¶4} Seneca County Deputy Sergeant Herrig ("Herrig") responded to the call.   When he arrived at the home, he did not see anyone.  Tr. 24.  Herrig then went to the side of the house and found A.E. and J.E. there.  *Id.*  Another officer who was present took the children to the house where Omlor let them enter.  Tr. 19.  Herrig called out to Currier, who he knew from prior occasions, and asked her to come out of the garage.  Tr. 12.  When Herrig approached her, she placed her hands behind her and put an object between her belt and pants.  *Id.*  Currier then showed Herrig her hands, which had fresh blood on them.  Tr. 13.  Herrig described the injuries as being scratches with droplets of blood.  Tr. 18.  The injuries were minor, so Herrig treated them and arrested Currier for violating the civil protection order.  Tr. 13.  Herrig found a small piece of glass in the small of Currier's back.  Tr. 13.   A.E. and J.E. were left in the care of Omlor.  Tr. 14, 21.  Herrig did not see G.C-O. at that time and had no concerns about G.C-O. at that time.  Tr. 17-18.

{¶5} On February 7, 2012, the Seneca County Department of Job and Family Services ("the Agency") filed a complaint alleging that G.C-O. was a dependent child as a result of what transpired on February 2, 2012.  The Agency moved for an *ex parte* order to place G.C-O. under the protective supervision of

the Agency, but to leave the child in the home of Omlor. The caseworker's affidavit indicated that she contacted Currier to notify her that they would be seeking to place the children in the homes of their respective fathers. The sole basis made for these claims was that the child would be emotionally harmed by Currier's threat to commit suicide. The trial court granted the motion for protective supervision and ordered that G.C-O. be placed with his father.[1]

{¶6} On May 8, 2012, and June 4, 2012, an adjudication hearing was held. The trial court determined that G.C-O. was a dependent child. Omlor filed objections to the magistrate's decision. The trial court overruled the objections and adopted the magistrate's decision finding G.C-O. to be dependent.[2] Omlor appeals from this judgment and raises the following assignments of error.

**First Assignment of Error**

**The finding that [G.C-O.] is a dependent child pursuant to [R.C. 2151.04(C)] is against the manifest weight of the evidence.**

**Second Assignment of Error**

**The trial court's finding that [G.C-O.] is dependent should be reversed because of the trial court's error in drawing a negative inference from [Omlor's] invocation of his Fifth Amendment right to remain silent.**

---

[1] This court notes that at the time of the order, Omlor already had custody of G.C-O. The other two children were in Currier's legal custody, but G.C-O. had previously been placed with Omlor by the juvenile court.

[2] The orders in this case were signed by two different judges throughout the case. The record does not disclose a reason for this.

Case No. 13-12-56

{¶7} In the first assignment of error, Omlor claims that the judgment is against the manifest weight of the evidence.

> **The adjudication of a child as dependent, neglected, or abused is the jurisdictional "hook" which allows for the on-going intervention by the State in the lives of children and their parents. It necessitates the juvenile court's consideration of the appropriate custodial disposition of the adjudicated child and permits the continued removal of children from their parents' homes. While not every parent's rights are terminated in these proceedings initiated by the local child welfare agency, some are. Other parents' rights are significantly curtailed by dispositional orders ranging from legal custody to a third party to planned permanent living arrangements. Given that it is the child's adjudication as dependent, neglected, or abused that opens the door to the possibility of the curtailing or termination of parental rights, we believe that the risk of error in these decisions too merits utilization of the criminal manifest weight standard of review. Therefore, in determining whether a juvenile adjudication is against the manifest weight of the evidence:**
>
> **"The court reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that the [adjudication] must be reversed. [*In re M.C.*, 9th Dist. No. 24797, 2009-Ohio-5544 (quoting *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997))].**

*In re M.H.*, 9th Dist. Wayne No. 09CA0028, 2009-Ohio-6911, ¶14.

> **Before a juvenile court may enter a finding of abuse or dependency, the state has the burden of establishing by clear and convincing evidence that a child is abused or [dependent]. * * * "Clear and convincing evidence is that measure or degree of proof which is more than a mere 'preponderance of the evidence,' but not to the extent of such certainty as is required beyond a reasonable doubt, in criminal cases, and which will**

-5-

> **produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established."** * * *

*In re C.B.*, 12th Dist. Butler Nos. CA2008-01-0002, CA2008-01-003, 2008-Ohio-5543, ¶10. "A dependency adjudication focuses not on the fault of the parents, but on 'the child's environment, including the condition of the home itself and the availability of medical care and other necessities.'" *In re V.R.,* 9th Dist. Summit No. 23527, 2008-Ohio-1457, ¶17 (quoting *In re T.W.*, 9th Dist. Summit No. 2381, 2008-Ohio-109, ¶11). To meet the burden of proof for a dependency finding, the Agency must present clear and convincing evidence of conditions that adversely affect the normal development of the child. *Id.*

{¶8} Here, the sole reason for finding the child dependent was the relationship between Omlor and Currier. "In the absence of evidence showing a detrimental impact upon the child of the relationship * * *, that relationship, as a part of the child's environment, does not warrant the state in removing the child from parental custody in the best interest of that child." *State v. Burrell*, 58 Ohio St.2d 37 (1979).[3] The majority of the evidence presented at the hearing had to do with Currier's instability and mental health issues. Currier testified that she had been diagnosed as a manic bipolar with a personality disorder. Tr. 64. There was some testimony concerning the negative affect of the relationship between Omlor

---

[3] The dissent claims that we are mistaken in holding that *Burrell* requires the Agency to prove that if it is claiming the parent's conduct is the basis of the dependency allegation, that the conduct is detrimental to the child. However, that is exactly what *Burrell* does say.

and Currier. However most of this testimony came from Currier herself. She testified that their relationship was on and off and that they were both very controlling, but that it was mostly her.[4] Tr. 65. She admitted that she had been physically violent with Omlor, but denied that he had ever been violent with her. Tr. 66. She also admitted that she would tell Omlor that she would kill herself to get his attention and make him do what she wanted. Tr. 84. However, Omlor did not give in to her demands and on one occasion had tried to take her to the hospital to receive help. Tr. 79, 84. Currier testified that she frequently had followed Omlor without his knowledge and had even entered his home in the middle of the night without his knowledge.[5] Tr. 87, 107. On the one occasion that she woke Omlor, he contacted her SAFY worker which led to the counseling session. Tr. 116. Omlor also took the time to make food for her other children who she had brought with her to break into his home.[6] Tr. 119.

---

[4] The dissent points to the trial court's finding that Omlor's behavior was controlling of Currier and that he was using the child. We agree, but the uncontradicted testimony of Currier was that she was more often trying to control him with threats of suicide. She testified that the restrictions on her visits made by Omlor, which formed the findings of controlling, were done when she was in a manic phase and as a way to force her to get the needed treatment. Tr. 86. Currier testified that these incidents were done when Omlor thought she was behaving unstably and to protect G.C-O. from her. Tr. 86. Isn't this what we want parents to do, to protect their children from people who are unstable even if the unstable person is also a parent?

[5] The dissent points to the fact that Omlor did attempt to stop Currier from having unlimited access to G.C-O. as one of the elements which shows that he did not protect G.C-O. However, the testimony showed that Omlor did not know about the break-ins. When he later learned that she was breaking into his home, he took steps to keep Currier out.

[6] Currier accessed the home by removing a window, placing J.E. through it, and having him unlock the door so that she and A.E. could enter the home. Currier did this because Omlor had taken steps to keep her out of the home.

{¶9} As for caring for and protecting G.C-O., Currier testified that Omlor denied her access to G.C-O. when he thought she was unstable. Tr. 86. She testified that on one occasion, Omlor had taken G.C-O. to the police department rather than allow her to take him while she was in the middle of one of her episodes. *Id.* She claimed that Omlor had allowed her to come to his house on January 31, 2012, for a counseling session with him and her counselors. Tr. 97-98. She then returned on February 1, 2012, but Omlor asked her to leave and she did. Tr. 98-99. She came a third time on February 2, 2012, and the incident forming the basis of the complaint occurred.[7] Tr. 99. Currier admitted that she was prescribed medicine for her mental issues, but stated that she is not good at remembering to take it for more than two or three days. Tr. 103. Currier conceded that it was emotionally harmful for the children to be around her when she was having her episodes. Tr. 110. However, Omlor frequently encouraged her to seek treatment for her illness and tried to assist her in getting the help she needed. Tr. 111. Since G.C-O. had been placed with Omlor, Currier believed that he was doing well and that Omlor protected G.C-O., including keeping G.C-O. away from her when she was having an episode. Tr. 112. Although Omlor could

---

[7] The dissent points to these visits in the two days prior as evidence that Omlor permitted Currier to violate the CPO. This is true, but belies the evidence. The first visit was done in the presence of Currier's counselors in an attempt to help Currier and Omlor reach an agreement on their relationship as G.C-O.'s parents. R. 97-98. The visit the next day was Currier coming to his house to discuss the relationship, Omlor asking her to leave, and Currier complying. Tr. 98-99. While technically a violation of the CPO, these two visits were not of the nature that the police needed to be contacted as there was no danger to anyone and both Omlor and Currier were acting like reasonable, responsible adults who share a child.

not keep her from following him and coming to his house, he did take steps to stop her from having unlimited access to G.C-O. Tr. 115.

{¶10} Daniel Cruikshanks ("Cruikshanks"), the clinical counselor who evaluated Currier, testified that the relationship between Currier and Omlor was not a positive one for Currier's mental health. He also testified that Currier would likely exhibit the same symptoms whenever she engaged in an intimate relationship. Tr. 146. The only difference in the repeated cycle of Currier's behavior is the name of the man with whom she is having the relationship. Tr. 147. Although he thought Currier had good parenting skills in that she takes good care of them, when she is agitated or distressed, she behaves irrationally and impulsively which can be potentially harmful to the children. Tr. 150. Cruikshanks did not testify that the relationship had any negative impact on G.C-O. in any way.

{¶11} There was no testimony that G.C-O. was aware of the dysfunctional relationship. The only testimony of this nature was that there was concern that G.C-O. might become aware of the problems and that it might have a negative effect on him. This is a statement of mere possibility, not probability. There was evidence from the Agency that Omlor was a good father and that the physical environment was safe and appropriate for a child of G.C-O.'s age. Tr. 45. There was also testimony that Omlor was careful to not only care for G.C-O. when

Currier was in the middle of one of her episodes, but also took care of A.E. and J.E. during that time as well. To find a child dependent merely because the relationship between the parents is unhealthy or erratic would find many children of divorcing parents also being labeled as dependent. There must be some nexus between the parents' relationship and the environmental impact on the child. "That impact cannot be simply inferred in general, but must be specifically demonstrated in a clear and convincing manner." *Burrell, supra* at 38. That was not the case here. The trial court in this case had no evidence that there was a detrimental impact and was merely inferring what could happen. This is insufficient to support a finding that the child was dependent. Therefore, the first assignment of error is sustained.

{¶12} The dissent claims that Omlor's aided Currier in her actions and claims that this is sufficient to show that Omlor is not behaving like a good parent and that G.C-O. is dependent. However, this ignores the reality of the situation. Omlor was the residential parent of G.C-O. dealing with a mentally ill mother of the child who has rights. Currier testified that Omlor did prevent her from taking G.C-O., but only when she was acting erratic. Tr. 86. The findings of the magistrate, which were accepted by the trial court, were one interpretation of what happened, but when the testimony is viewed in context, it does not indicate inappropriate actions. For example, the alleged "race" to the child involved an

Case No. 13-12-56

incident in which Currier was behaving erratically and was determined to take G.C-O. Tr. 78-87. Omlor called his sister, who was babysitting G.C-O. and told her to take him to the police station. Tr. 78-87. At the police station, G.C-O. was released to Omlor, not Currier due to her mental state at that time. Tr. 85-95. Taking steps to protect G.C-O. from Currier's episodes is not improper parenting behavior.

{¶13} Omlor claims in his second assignment of error that the trial court erred by considering his invocation of his Fifth Amendment right to avoid self-incrimination. Our disposition of Omlor's first assignment of error renders the second assignment of error moot. Therefore, this court will not address the issue further. App.R. 12(A)(1)(c).

{¶14} Having found error prejudicial to the appellant, the judgment of the Court of Common Pleas of Seneca County, Juvenile Division, is reversed and the matter is remanded for further proceedings.

*Judgment Reversed*
*And Remanded*

**ROGERS, J.J., concurs in Judgment Only.**

**/jlr**

-11-

Case No. 13-12-56

**SHAW, J., Dissents.**

{¶15} For the following reasons, I respectfully dissent from the majority opinion. At the outset, I would like to note that the decision of the magistrate and the subsequent judgment entry of the trial court demonstrate that both conducted a thorough review of the evidence in this case and engaged in a comprehensive analysis in arriving at the decision to find G.C-O. a dependent child.

{¶16} The record establishes that the initiation of the Agency's involvement in this case stemmed from the incident on February 2, 2012 at Omlor's home. Testimony at the adjudication hearing established that Currier had been at Omlor's home the two days preceding the incident and that the two were attempting to reconcile during this time. Notably, Omlor's meeting with Currier was done in deliberate violation of the CPO he had obtained against her a month earlier. On the date of the incident, the third straight day of violating the CPO, Currier arrived at Omlor's home with five-year-old A.E. and four-year-old J.E. This time Omlor had apparently decided that he had enough of Currier's emotional instability. As a result, he refused to let her in his home and threatened to call the Sheriff. According to her own testimony at the adjudication hearing, Currier begged Omlor not to call the Sheriff and then, in the presence of A.E. and J.E., grabbed a pane of glass and stated "If you call the Sheriff then I'm gonna go up on your roof and I'm gonna jump off and cut my neck." (Tr. at 59).

{¶17} Currier next recalled seeing a Sheriff's vehicle arrive at the house. She then told her A.E. and J.E. to "stay right there" and "took off running" toward the garage and proceeded to cut her arm just below the elbow three times. (Tr. at 60-61). Shortly thereafter, Sgt. William Herrig confronted Currier. Sgt. Herring testified that he observed Currier with the broken piece of glass in her hand and noticed fresh blood on her arm. The record indicates that Currier's wounds were minor. Sgt. Herrig placed Currier under arrest for violating the CPO. He recalled that A.E. and J.E. were scared due to the presence of three police officers, and that they appeared to be concerned about what was going to happen to their mother and wanted to follow her. As noted by the majority, G.C-O., the child at issue in this case, was asleep in Omlor's home while the events transpired.

{¶18} The Agency subsequently initiated these proceedings based upon this incident at Omlor's home. When the ongoing caseworker spoke to A.E. and J.E. about the incident, they both were able to articulate the fact that their mother cut herself that day. In particular, A.E. reenacted to the caseworker the motions of her mother cutting her own wrist.

{¶19} The magistrate distilled the caseworker's testimony in the following manner to describe the basis for Agency filing the complaints alleging all three children, including G.C-O., to be dependent children pursuant to R.C. 2151.04(C).

> **The DJFS filed the instant complaints due to concerns regarding the children's safety due to the volatile relationship between**

> **[Currier] and [Omlor], and the resulting CPO violations. The DJFS was concerned as to the possibility of emotional harm to the children on what they observe[d], and the risk of physical harm due to the actions of [Currier], and the purported ambivalence of [Omlor]. The DJFS substantiated neglect. As to the lack of any involvement regarding [G.C-O.] on February 2, 2012, the worker stated that her concerns were based on the preceding two days and the fact that [Omlor] and [Currier] were together in violation of the CPO. She testified that even if the children did not see [Currier] cut herself on February 2, 2012, the effect was the same since they were aware of the situation and the involvement of law enforcement. The worker had sufficient concerns regarding the environment involving [Currier], [Omlor] and all three children, to file the complaint alleging Neglect and Dependency. The fact that on February 2, 2012 [Currier] was at [Omlor's] home for the third straight day, coupled with the domestic dispute between them that resulted in her putting a piece of glass to her neck and threatening to cut her throat [and] threaten[ing] to jump off the roof; and finally cutting her arm when police were called all resulted in her determination that the children were in an unsafe environment.**

(Doc. No. 36 at 6-7).

{¶20} In addition to the February 2, 2012 incident, the record is replete with examples demonstrating the volatile nature of Currier and Omlor's relationship. In particular, Currier admitted that she has been physically violent with Omlor. She also admitted that on numerous occasions she had threatened to kill herself by wrapping her car around a telephone pole or jumping in front a train. Currier admitted that many of the threats were made in the presence of A.E. and J.E. At the adjudication hearing, Currier was unabashful about her conduct

and claimed the suicide threats were just for attention, to get a reaction out of Omlor, or a method to get what she wants.

{¶21} Currier recounted an incident in which she followed Omlor in her car just "to see where [he] was going." (Tr. at 87). The pursuit culminated in a yelling match in front of the police station with Omlor's sister, who was driving Omlor in her car. Currier admitted that A.E. and J.E. were in the back seat of her vehicle at the time.

{¶22} Currier also described numerous incidents in which she would enter Omlor's home at night without his knowledge and with both A.E. and J.E. in tow. Currier admitted that her rationale behind this conduct was that Omlor "couldn't make [her] leave once [she] got in." (Tr. at 107). Even after Omlor changed his locks, Currier continued to engage in this behavior. She recounted more than one instance where she either opened or removed a window and placed J.E. through the open window with instructions to unlock the front door for her.

{¶23} Even though these examples are demonstrative of Currier's erratic behavior and emotional instability, it is clear that what the magistrate and trial court found troubling, and what the majority seemingly overlooks, is Omlor's role in these situations. While there is evidence in the record indicating that on several occasions Omlor contacted law enforcement, the Agency, or other service providers in response to Currier's erratic actions, the record also suggests that

Case No. 13-12-56

Omlor was not consistent in rebuking Currier, and that at times he was even a willing participant in the relationship drama. The magistrate identified a specific incident elicited in the testimony that he found noteworthy.

> **One such incident involved a dispute between [Currier] and [Omlor] regarding who would have "possession" of [G.C-O.] for the weekend. Apparently both [Currier] and [Omlor] believed they were to care for [G.C-O.] at that time. [G.C-O.] was being watched by [Omlor's] sister, both parties were in a "race" to secure possession of the child. It appears that this "race" was "won" by [Omlor], and that neither party was overly concerned with their actions affecting the children. On another occasion testimony was received regarding an incident in Wood County in June 2011 where [Currier] and [Omlor] were involved in an altercation with the children present. The result of this encounter was another inappropriate dispute with the children (all three of them) present.**

(Doc. No. 36 at 8).

{¶24} The magistrate also made the following observation in his decision.

> **What is troubling is the fact that there is no record or evidence as to what [Omlor] did to address the "break in" or the ongoing occasions of disputes between them. It appears to the Court that [Omlor] is often a willing participant in the conflict and may feed on the attention given to him by [Currier]. The concern is that during all the drama between [Currier] and [Omlor], the children are either present or directly affected.**

(Id.)

{¶25} The trial court after conducting its de novo review of the record made a similar observation.

> **The fact that the child (G.C-O.) was not a participant to any actual harmful event does not mitigate the "environment" that**

-16-

> **[Omlor] and [Currier] created that the child was placed in. The uncontested responses to the events by William Omlor, as described by Tonya Currier, varied from promotion, to acceptance to avoidance. The picture of William Omlor is one of a controlling and willing participant in the failings of Tonya Currier. It is clear that William Omlor at times will use the child as a "tool" in his attempts to control [Currier].**

(Doc. No. 95 at 5).

{¶26} The observations made by both the magistrate and the trial court regarding Omlor's role in the volatile relationship with Currier are supported by testimony presented by the Agency at the adjudication hearing. Omlor chose not to testify and therefore failed to provide any evidence to rebut this testimony.

{¶27} As previously discussed, the Agency alleged G.C-O. to be a dependent child under R.C. 2151.04(C). The statute defines a dependent child as one "[w]hose condition or environment is such as to warrant the state, in the interests of the child, in assuming the child's guardianship[.]" R.C. 2151.04(C). The Agency alleged that the tumultuous relationship between Currier and Omlor, specifically as exemplified in the February 2, 2012 incident, demonstrated that the G.C-O. is in an unsafe environment due to his parents' conduct and is at risk for suffering emotional harm.

{¶28} In reversing the decisions of the magistrate and trial court, the majority discounts their specific findings and conclusions with regard to Molar's role in the relationship, and instead relies solely on *In re Burrell*, 58 Ohio St. 2d

37 (1979). In *Burrell*, the Supreme Court of Ohio reversed a trial court's determination finding the children dependent pursuant to R.C. 2151.04(C) based solely upon their mother's decision to raise her children in the same home as her live-in boyfriend and her refusal to "legitimize" the relationship—i.e., through marriage. (*Id.* at 37).

**{¶29}** In a very brief per curiam opinion the Court in *Burrell* held:

**In the absence of evidence showing a detrimental impact upon the child of the relationship established as here existing, that relationship, as a part of the child's environment, does not warrant the state in removing the child from parental custody in the best interest of that child. Here, the evidence is inadequate to establish a present or potential detrimental impact under the standard set forth in R.C. 2151.35 of "clear and convincing evidence" that the child is a dependent child. The conduct of a parent is relevant under the terms of this specific section solely insofar as that parent's conduct forms a part of the environment of this child. As a part of the child's environment such conduct is only significant if it can be demonstrated to have an adverse impact upon the child sufficiently to warrant state intervention. That impact cannot be simply inferred in general, but must be specifically demonstrated in a clear and convincing manner. Here, such was not the case.**

(*Id.* at 39).

**{¶30}** Clearly, the situation in *Burrell* is distinguishable from the one in the case at hand. Nevertheless, the majority has extrapolated the ruling in *Burrell* to stand for the proposition that any time a parent's conduct forms the basis for an allegation of dependency under R.C. 2151.04(C), the Agency must prove by clear and convincing evidence that the child in question suffered a detrimental impact.

Under the majority's proposition, regardless of how egregious the conduct of a parent is, or the significance of the potential risk of physical or emotional harm posed to the child under the circumstances, the Agency must sit back and wait until the child either suffers or is old enough to personally acknowledge some kind of actual harm before an action for dependency can be filed. I believe this is contrary to the rationale underpinning the dependency statutes which is to preserve the best interest, safety, and welfare of the child. *See In re Burchfield*, 51 Ohio App.3d 148, 156 (1988) (stating "the law does not require the court to experiment with the child's welfare to see if * * * [the child] will suffer great detriment or harm").

{¶31} In this case, there was evidence before the court establishing that the parents have a significant history of overtly displaying the volatility of their relationship to the children. The record also confirms that the parents in this case have a complete disregard for the potential physical, mental, and emotional harm their behavior has on the children. Thus, the evidence here demonstrates more than just a general inference that the parents' conduct poses a present or potential detrimental impact on G.C-O. In fact, the record establishes that the parents' tumultuous relationship had already created a detrimental impact on the two older children, A.E. and J.E.

{¶32} Therefore, contrary to the rule endorsed by the majority, I believe that the specific instances in this record are sufficient for a rational trier of fact to specifically infer that the elements of dependency under R.C. 2151.04(C) have been met. Accordingly, I would overrule the first assignment of error and proceed to address the second assignment of error.

**/jlr**