[Cite as *In re L.S.*, 2020-Ohio-5469.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## ALLEN COUNTY

IN RE:

    L.S.,                                                                 CASE NO.  1-20-19

ADJUDICATED DEPENDENT
AND ABUSED CHILD.

                                                     O P I N I O N

[CHEYENNE HOOPER - APPELLANT]

---

**Appeal from Allen County Common Pleas Court
Juvenile Division
Trial Court No. 2019 JG 36259**

**Judgment Affirmed**

**Date of Decision:   November 30, 2020**

---

APPEARANCES:

    *Linda Gabriele* **for Appellant**

    *Rebecca S. King-Newman* **for Appellee**

**ZIMMERMAN, J.**

{¶1} This is an appeal from the Allen County Court of Common Pleas, Juvenile Division, adjudicating L.S. to be an abused and dependent child. For the reasons that follow, we affirm.

{¶2} L.S., was born in 2018, to her mother, Cheyenne Hooper ("Cheyenne"), and her father, Ebin Stratton ("Ebin"). (Doc. No. 42). Cheyenne and Ebin were never married to each other. On March 13, 2019, the Allen County Children Services Board ("the agency") was notified through a physical-abuse report that L.S. had been life-flighted from St. Rita's Medical Center ("SRMC") to Nationwide Children's Hospital ("NCH"). (*See* Doc. No. 9); (Aug. 12, 2019 Tr. at 38); (Aug. 15, 2019 Tr. at 18).

{¶3} After investigating the abuse report, the agency sought to establish an out-of-home-safety plan with Dawn Stratton, the paternal grandmother of L.S.[1] (*Id.*); (Aug. 15, 2019 Tr. at 7). Regardless, at the shelter-care hearing on July 15, 2019, the trial court determined that probable cause existed to believe that L.S. was an abused and dependent child; that it was in L.S.'s best interest to be placed in the temporary custody of Ebin; and that

> *reasonable efforts* were made by the Allen County Children Services
> Board to prevent the placement and removal of [L.S.] from [her] home
> prior to July 15, 2019, and thereafter to eliminate the continued

---

[1] It appears from our review of the record that the agency filed its complaint under a separate case number (a record we do not presently have before us) and that its complaint was later dismissed and refiled under the existing case number where a shelter-care hearing was held. (*See* Aug. 12, 2019 Tr. at 9).

removal of [L.S.] from the home, and to make it possible for [L.S.] to return and/or remain in the home.

(Emphasis sic.) (Doc. No. 7). The following day, the agency filed a complaint in the trial court alleging L.S. to be an abused child under 2151.031(B) and (C), and a dependent child under R.C. 2151.04(C). (Doc. No. 8).

{¶4} After the adjudicatory hearing (on August 12 and 15, September 17, and October 10, 17, and 29, 2019), the magistrate took the matter under advisement and later issued a decision finding L.S. to be an abused and dependent child under R.C. 2151.031(C) and R.C. 2151.04(C). (Doc. No. 77). Further, the magistrate found that "the agency did make reasonable efforts to prevent the removal of [L.S.] from the home/to make it possible for [L.S.] to return home[]" through case-management and investigation, placement of L.S. with Ebin, and orders limiting Cheyenne's contact with L.S. (*Id.*).

{¶5} On November 22, 2019, the parties presented a proposed agreement as to the disposition of L.S. to the magistrate. (Nov. 22, 2019 Tr. at 2). The magistrate accepted and adopted the parties' agreement which included: the grant of legal custody of L.S. to Ebin with a graduated-supervised-parenting-time-visitation schedule for Cheyenne. (*Id.*); (Doc. No. 85). Importantly, the parties agreed dispositional order provided that reasonable efforts were made by the agency to

prevent the removal of L.S. through case management and investigation services, placement with Ebin, and orders limiting Cheyenne's contact with L.S.[2] (*Id.*).

{¶6} Nevertheless, on November 22, 2019, Cheyenne filed objections to the magistrate's decision on adjudication. (Doc. No. 79, 80, 81, 82, 83, 84). Notice was sent to the parties on January 10, 2020 that the transcripts had been filed by the court reporter. (Doc. No. 88). After which, Cheyenne filed supplemental objections to the magistrate's decision on adjudication, Cheyenne objected to the magistrate's findings of fact. (Doc. No. 89). The agency filed its memorandum in opposition to Cheyenne's objections on February 6, 2020. (Doc. No. 90).

{¶7} The trial court conducted its independent review of adjudication and determined that the magistrate properly decided the factual issues and appropriately applied the law and denied Cheyenne's objections. (Doc. No. 91). On March 6, 2019, the trial court journalized its judgment entries on adjudication and disposition. (Doc. Nos. 92, 93).

{¶8} Cheyenne filed a notice of appeal on April 1, 2020 and presents two assignments of error, which we will address together. (Doc. No. 94).

---

[2] Cheyenne and Ebin resided together as an intact family in the same home located in Lima, Ohio 45801 at the time the physical-abuse report was made. (*See* Aug. 12, 2019 Tr. at 37-40); (*See* Aug. 15, 2019 Tr. at 4-6). However, following the physical-abuse report and prior to the shelter-care hearing in this case, Cheyenne moved out of the home, and at all times relevant to this proceeding, Ebin continued to reside in the same home with L.S. (*See* Doc. No. 1, 5, 6, 7, 8, 9).

**Assignment of Error No. I**

**The Trial Court's Decision Is Against The Manifest Weight Of The Evidence. Appellee Did Not Prove By Clear And Convincing Evidence That The Minor Child Was Abused And/Or Dependent.**

**Assignment of Error No. II**

**The Trial Court Committed Prejudicial Error In Finding That The Allen County Children Services Board Made Reasonable Efforts To Return The Child To The Custody Of The Appellant.**

{¶9} In her first assignment of error, Cheyenne argues that the trial court's determination that L.S. is an abused and dependent child is against the manifest weight of the evidence. In her second assignment of error Cheyenne asserts that the trial court erred in finding that the agency made reasonable efforts to return L.S. to Cheyenne.

*Standard of Review*

{¶10} Abuse, neglect, and dependency cases are initiated by the filing of a complaint in juvenile court. *See* Juv.R. 22(A); Juv.R. 10; R.C. 2151.27(A). The complaint is "the legal document that sets forth the allegations that form the basis for juvenile court jurisdiction." Juv.R. 2(F). *See* R.C. 2151.23. The juvenile court must base its adjudication on the evidence adduced at the adjudicatory hearing to support the allegations in the complaint. *See In re Hunt*, 46 Ohio St.2d 378, 380 (1976). If allegations in the complaint are not proven by clear and convincing evidence at the adjudicatory hearing, the juvenile court must dismiss the complaint.

Juv.R. 29(E)(4), (F); R.C. 2151.35(A)(1). "'"'Clear and convincing evidence is that measure or degree of proof which is more than a mere 'preponderance of the evidence,' * * * and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established."'"' *In re S.L.*, 3d Dist. Logan Nos. 8-17-25, 8-17-26, 8-17-27, 8-17-28, 8-17-29, 8-17-33, 8-17-34, 8-17-35, 8-17-36, and 8-17-37, 2018-Ohio-1111, ¶ 14, quoting *In re G.C-O.*, 3d Dist. Seneca No. 13-12-56, 2013-Ohio-4974, ¶ 7, quoting *In re C.B.*, 12th Dist. Butler Nos. CA2008-01-002 and CA2008-01-003, 2008-Ohio-5543, ¶ 10. Here, Cheyenne argues that weight of the evidence does not support the trial court's determination that L.S. is an abused and dependent child or that the agency made reasonable efforts to return L.S. to Cheyenne, thus, reunifying the family.

{¶11} We apply the criminal-manifest-weight-of-the-evidence standard for reviewing challenges in juvenile proceedings. *In re S.L.*, 2018-Ohio-1111, at ¶ 12, citing *In re Corey Children*, 11th Dist. Geauga No. 2005-G-2649, 2006-Ohio-2013, ¶ 17. Under this standard, when reviewing a claim that a judgment is against the manifest weight of the evidence, we must review the entire record, weighing both the evidence and all reasonable inferences, considering the credibility of witnesses, and determining whether in resolving conflicts, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that a new trial must be ordered. *Id.* at ¶ 12, citing *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983). "'The

discretionary powers to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction [, or in this case, an adjudication of abuse and dependency].'" *Id.*, quoting *Martin* at 172. Our role is limited to weighing the evidence introduced at trial and then determining whether the state carried its burden of persuasion. *Id.* at ¶ 13, citing *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997). We must defer to the factual findings of the trier of fact as to the weight to be given the evidence and the credibility of the witnesses. *Id.*, citing *State v. DeHass*, 10 Ohio St.2d 230 (1967), paragraph one of the syllabus.

{¶12} "'Once the clear and convincing standard has been met to the satisfaction of the [juvenile] court, the reviewing court must examine the record and determine if the trier of fact had sufficient evidence before it to satisfy this burden of proof.'" *Id.* at ¶ 15, quoting *In re Kinney*, 1st Dist. Hamilton No. C–020067, 2002-Ohio-2310, 2002 WL 950266, *2, (May 10, 2002), citing *In re Adoption of Holcomb*, 18 Ohio St.3d 361, 368. We will not reverse the judgment of a trial court as being against the manifest weight of the evidence which is supported by some competent, credible evidence. *Id.* at ¶ 15, citing *In re Mercer*, 10th Dist. Franklin No. 04AP-422, 2005-Ohio-1845, ¶ 20, citing *C.E. Morris Co. v. Foley Constr. Co.*, 54 Ohio St.2d 279, syllabus.

*Manifest-Weight Analysis*

**{¶13}** Here, Cheyenne challenges the trial court's finding that L.S. is an abused and dependent child. An abused child includes any child who "[e]xhibits evidence of any physical or mental injury or death, inflicted other than by accidental means, or an injury or death which is at variance with the history given of it." R.C. 2151.031(C). A dependent child means any child "[w]hose condition or environment is such as to warrant the state, in the interests of the child, in assuming the child's guardianship[.]" R.C. 2151.04(C).

**{¶14}** To establish abuse and dependency the State presented two witnesses in its case in chief: Dr. Catherine Huber ("Dr. Huber"), an expert in general pediatrics specifically in the area of child-abuse pediatrics, and the agency's investigative caseworker, Nicole Mikesell. (Aug. 12, 2019 Tr.); (Aug. 15, 2019 Tr.); (Sep. 17, 2019 Tr.). Cheyenne presented three witnesses in her case in chief: Patty Doering, Cheyenne's mother (L.S.'s maternal grandmother), Dr. Todd Hixenbaugh ("Dr. Hixenbaugh") the emergency room ("ER") doctor who treated L.S. at SRMC, and Dr. Marcus DeGraw ("Dr. DeGraw") an expert in child-abuse pediatrics.[3] (Sep. 17, 2019 Tr.); (Oct. 10, 2019 Tr.); (Oct. 17, 2019 Tr.). Further, Lima Police Department Detective, Matt Woodworth, testified for the State as a rebuttal witness. (Oct. 29, 2019 Tr.).

---

[3] Doering also happens to be a pediatric nurse at SRMC, but was not qualified as an expert witness in the instant case.

{¶15} Here, it is important to note that there were no independent eye witnesses to L.S.'s injuries according to the history reported to medical providers by the parents. (*See* Aug. 12, 2019 Tr. at 38); (Aug. 15, 2019 Tr. at 6); (Oct. 10, 2019 Tr. at 44); (Oct. 29, 2019 Tr. at 21). On appeal, Cheyenne's avers that Dr. DeGraw's and Dr. Hixenbaugh's testimonies contradicted Dr. Huber's findings. For the reasons that follow, we disagree.

{¶16} Dr. Huber's testimony revealed that she performed a physical examination of L.S. and obtained the relevant medical, developmental, and family histories (of L.S.) from Cheyenne and Ebin. (Aug. 12, 2019 Tr. at 26). Ultimately, Dr. Huber testified that her expert opinion as to L.S. injuries was:

> [t]he history that was provided of the accidental fall off of the bed was not sufficient for the degree of injury that the child had sustained, and therefore, the diagnosis of abusive head trauma and physical abuse were made.

(*Id.* at 45).

{¶17} Dr. Huber further testified that based upon a skeletal survey and the radiological study of L.S.'s body, the likely "mechanism for abusive-head trauma is a rapid acceleration/deceleration injury" and the most common form of such injury is shaking. (*Id.* at 47-48). According to Dr. Huber, L.S.'s injuries (i.e., a large left subdural hemorrhage with a mid-line shift and a small right subdural hemorrhage) created a substantial risk to her health and safety. (*Id.* at 30, 32, 48, 52). Importantly, Dr. Huber testified that while a fall off of a bed at the height reported

by Cheyenne would cause direct trauma, it would not have caused the acceleration/deceleration injury. (*Id.* at 52). Dr. Huber further testified that the bleeding in two of the three layers of L.S.'s retinal layers indicated that an excessive amount of force was used upon her. (*Id.* at 53). Moreover, Dr. Huber testified that L.S.'s neck injury supports the acceleration/deceleration mechanism, and thus, her abusive-head-trauma and physical-abuse diagnoses. (*Id.* at 55).

{¶18} Dr. Hixenbaugh (a general and trauma surgeon at SRMC) testified that he had no independent recollection of treating L.S., other than his notes, and according to his notes, he saw no signs of abuse. (Oct. 10, 2019 Tr. at 7-8).

{¶19} Dr. DeGraw, Cheyenne's expert witness, testified that he reviewed documents related to L.S.'s treatment (i.e., medical records, the radiological reports and images, and Dr. Huber's testimony), and disagreed with Dr. Huber's opinion that L.S.'s injuries were abusive-head trauma. (*Id.* at 18-21). Specifically, Dr. DeGraw disputed the primary mechanism (i.e., cause of the injury) identified by Dr. Huber, and thus he could not rule out a direct-impact mechanism. (*Id.* at 45). According to Dr. DeGraw, if L.S. had an occipital impact (a direct injury to the back of L.S.'s head) or mechanics (L.S.'s head struck something) that such a direct-impact mechanism could lead to the type of injuries L.S. sustained. (*Id.* at 21, 45).

{¶20} Importantly, and in our review of the record, there is no evidence in the record that L.S. actually suffered either an *occipital impact* or was found lying

on her back. (*Id.* at 48). Dr. DeGraw testified that L.S.'s neck injuries were extremely rare, and that there has never been an identified study with those type of neck injuries. (*Id.* at 47). Nevertheless, Dr. DeGraw testified that the most typical explanation for the compilation of injuries that L.S. sustained was "blunt-force, repetitive blunt force, or shaking injury to the head of a child", and that those explanations would be more likely than an occipital fall. (*Id.*). Thus, in our review, we conclude that Dr. Hixenbaugh's and Dr. DeGraw's opinions do not contradict Dr. Huber's ultimate diagnosis of abuse.

{¶21} Based on the foregoing, we conclude that there is competent, credible evidence to support the trial court's determination that L.S. is an abused and dependent child. Thus, we will not reverse this judgment of the Allen County Court of Common Pleas, Juvenile Division, as being against the manifest weight of the evidence.

{¶22} Accordingly, Cheyenne's first assignment of error is overruled.

*Reasonable-Efforts Analysis*

{¶23} Turning to the Cheyenne's reasonable-efforts argument, we recognize that the Supreme Court of Ohio has held that

> [n]o one section of the Revised Code addresses the concept of reasonable efforts. Overall, Ohio's child-welfare laws are designed to care for and protect children, "whenever possible, in a family environment, separating the child from the child's parents only when necessary for the child's welfare or in the interests of public safety." R.C. 2151.01(A). To that end, various sections of the Revised Code

refer to the agency's duty to make reasonable efforts to preserve or reunify the family unit.

*In re C.F.*, 11 Ohio St.3d 73, 2007-Ohio-1104, ¶ 29. In particular, under R.C. 2151.419, when a trial court

> removes a child from the child's home or continues the removal of a child from the child's home, the court shall determine whether the public children services agency * * * has made reasonable efforts to prevent the removal of the child from the child's home, to eliminate the continued removal of the child from the child's home, or to make it possible for the child to return safely home.

R.C. 2151.419(A)(1). The Supreme Court of Ohio has further held that

> the trial court is only obligated to make a determination that the agency has made reasonable efforts to reunify the family at "adjudicatory, emergency, detention, and temporary-disposition hearings, and dispositional hearings for abused, neglected, or dependent children, all of which occur prior to a decision transferring permanent custody to the state."

*In re B.S.*, 3d Dist. Allen No. 1-15-44, 2015-Ohio-4805, ¶ 36, quoting *In re C.F.* at ¶ 41.

{¶24} Here, the trial court concluded at the shelter-care hearing that case-management and investigation, relative-placement, and child-abuse-assessment services did not prevent removal of L.S. at the shelter-care hearing as a result of the nature of L.S.'s neck injury, a large left subdural hemorrhages with a mid-line shift, a small right subdural hemorrhage, and retinol hemorrhages, which were

inconsistent with Cheyenne's explanation of a short fall off of the bed.[4]  (Doc. Nos. 7, 8).  Nevertheless, and immediately thereafter, L.S. was placed in Ebin's temporary custody in lieu of removal from the home pending adjudication.  (Doc. No. 7).  Further, at adjudication, the magistrate again made findings in her decision that "the agency did make reasonable efforts * * * to make it possible for [L.S.] to return home[]" through case-management and investigation, placement of L.S. with Ebin, and orders limiting Cheyenne's contact with L.S.  (Doc. No. 77).

{¶25} Finally, the magistrate, once again, addressed *reasonable efforts* at the November 22, 2019 dispositional hearing, to which the parties agreed, through management and investigation services, placement with Ebin, and orders limiting Cheyenne's contact with L.S. enabled L.S. to return home.  (Doc. No. 85).

{¶26} In this case, the magistrate specifically found the agency had made *reasonable efforts* at the shelter-care hearing, at adjudication, and finally at disposition by placing her first into the temporary custody and later legal custody of Ebin (L.S.'s biological father).  (*See* Doc. Nos. 7, 9, 42, 77).  These findings were adopted by the trial court.  (Doc. No. 92).

{¶27} Thus, under the facts before us, we conclude that the trial court did not err by determining that the agency had made reasonable efforts to reunify the family,

---

[4] Ebin had left for work and was not home at the time that L.S. sustained her injuries.  (Doc. Nos. 7, 9, 77); (Aug. 12, 2019 Tr. at 37-39); (Aug. 15, 2019 Tr. at 5).

and that such a determination is supported by clear and convincing evidence in the record.

**{¶28}** Accordingly, Cheyenne's second assignment of error is overruled.

**{¶29}** Having found no error prejudicial to the appellants herein in the particulars assigned and argued, we affirm the judgment of the trial court.

***Judgment Affirmed***

**SHAW, P.J. and PRESTON, J., concur.**

**/jlr**