[Cite as *In re O.M.*, 2023-Ohio-341.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
### HANCOCK COUNTY

IN RE:

   O.M.,                                          CASE NO. 5-22-08

ADJUDGED NEGLECTED AND
DEPENDENT CHILD.                      O P I N I O N

[REAGAN M. – APPELLANT
CORY D. – APPELLANT]

IN RE:

   A.D.,                                          CASE NO. 5-22-09

ADJUDGED NEGLECTED AND
DEPENDENT CHILD.                      O P I N I O N

[REAGAN M. – APPELLANT
CORY D. – APPELLANT]

**Appeals from Hancock County Common Pleas Court
Juvenile Division
Trial Court Nos. 2022-AND-0002 and 2022-AND-0003**

**Judgments Affirmed and Appeals Dismissed in Part**

**Date of Decision: February 6, 2023**

APPEARANCES:

   *Scott Smith* **for Appellant, Reagan M.**

   *Aaron J. Reid* **for Appellant, Cory D.**

   *Justin J. Kahle* **for Appellee**

**SHAW, J.**

{¶1} Appellant Reagan M. ("Reagan") appeals the judgments of the Juvenile Division of the Hancock County Court of Common Pleas, alleging that the trial court erred in failing to dismiss the complaints filed by the Hancock County Job and Family Services, Child Protective Services Unit ("CPSU"); that the trial court failed to comply with the Ohio Rules of Juvenile Procedure and Ohio Rules of Evidence during the adjudicatory hearing; that the judgments of the trial court are against the manifest weight of the evidence; and that the trial court erred in finding that CPSU had engaged in reasonable efforts to prevent the removal of the children from the home. For the reasons set forth below, the judgments of the trial court are affirmed.

*Facts and Procedural History*

{¶2} Reagan is the mother of O.M. and A.D. Doc. A2, B2. Tr. 69, 160-161. Cory D. ("Cory") is the father of A.D. Doc. B2. O.M. was born in December of 2018 and A.D. was born in September of 2020. Tr. 160. At around 11:30 P.M. on November 22, 2021, Patrolman Benjamin Stoner ("Patrolman Stoner") of the Findlay Police Department was dispatched to the residence where Reagan lived after a domestic dispute had been reported at that location. Tr. 28-29, 53. When Reagan opened the front door of the residence, Patrolman Stoner observed that she had a scratch mark on her forehead and on her arm. Tr. 30, 33. Patrolman Stoner then

talked to Reagan outside the residence while another police officer spoke with Cory in the house.  Tr. 29-30, 44-45.

{¶3} During this conversation, Reagan indicated that Cory had attacked her and that they had gotten physical.  Tr. 30.  She said that the scratch mark on her forehead Patrolman Stoner observed was caused by them fighting.  *Id.*  During the physical altercation following a heated verbal argument, she said Cory grabbed her, threw her to the floor, and he was on top of her and holding her down.  Tr. at 31.  After indicating that she was being hurt, Cory got off of her and she agreed that she would not call the police at that point.  Tr. 31-32.  She said things cooled off, but when they started talking about their issues again, she had dumped a bowl of macaroni on Cory and infuriated him to where he had attacked her again, threw her down to the ground, was grabbing hold of her and the fight was on again at that point.  Tr. 32.  However, Reagan and Cory gave conflicting reports as to who had been the primary aggressor in the fight because he described it more like one physical incident after Reagan had thrown the bowl of macaroni and several toys at him.  Tr. 34-36.  At one point, the police had intended to bring both parents into custody over this incident.  Tr. 36.  The police then contacted CPSU to discuss what options were available to provide care for the children, who were in the home at the time.  Tr. 37.

**{¶4}** The police ultimately decided that the appropriate course of action was to bring Cory into custody while Reagan went to the hospital to have her neck and back examined. Tr. 33, 37. Reagan had the police contact the grandparents of the children to provide care for the children that night. Tr. 37-38. Arrangements were then made for A.D. to stay with Cory's mother while O.M. went to stay with Reagan's mother, Sharon Schmits ("Schmits"). Tr. 38. After provision for the children had been secured, a worker from CPSU arrived at the house. Tr. 70. While this worker was told that CPSU's assistance was not needed, she "continued to respond" because "she was already there * * *." Tr. 70.

**{¶5}** Patrolman Stoner then went to the hospital to determine Reagan's status. Tr. 39. At the hospital, Reagan had agreed to have a SANE exam performed because she had reported that Cory had forced himself on her earlier that day. Tr. 39.[1] But Patrolman Stoner later testified that he was not aware of any sexual assault charges being filed as a result of this allegation. Tr. 54.

**{¶6}** On December 2, 2021, Kelly Miller ("Miller"), an intake investigator with CPSU, met with Reagan. Tr. 68, 70, 92. Miller recounted Reagan's description of the November 22 incident at her home, including that Cory "had choked her,

---

[1] Reagan indicated that the fight had been about whether Cory "had been messing around with another woman and that it was because * * * she [Reagan] wasn't giving him enough sex * * *." Tr. 42. Reagan then reported "that Cory and her started arguing about this. He gets up in her face and starts screaming at her saying that you're going to, we're going to have sex and then she just felt compelled just because of just how aggressive he was * * *." Tr. 42-43.

pulled her hair, covered her mouth and her nose" and "had kicked her in the stomach" when she had stood up to try to get away. Tr. 70. Miller told Reagan that CPSU did not want Cory to have unsupervised access to the children while the agency was involved or to be in the home, and that it needed both parties to engage in services with Open Arms and mental health treatment. *Id.* There was also a municipal court's no-contact order in effect shortly after the incident happened between Reagan and Cory. Tr. 212.

{¶7} During a home visit by CPSU on December 30, 2021, Miller testified that, in response to questioning whether Cory had been in Reagan's home, Reagan initially denied that Cory had been in the home, but then admitted that Cory had stayed there for two days over Christmas. Tr. 71, 78.

{¶8} On January 18, 2022, CPSU requested an after-hours welfare check on Reagan's residence. Tr. 83. When the police arrived, Cory was present. Tr. 84. The next day, when Miller spoke to Reagan, she had at first denied that Cory had been in the home until Miller brought up the fact that the police had seen him, at which time Reagan did admit it. *Id.* Reagan also admitted that Cory would park down the street and walk to her residence. *Id.* At this time, it was determined that CPSU was going to file complaints, seeking removal of the children from the home, as well as subsequently attempt to initiate an out-of-home safety plan. Tr. 85, 109-110.

{¶9} On January 26, 2022, the trial court issued ex parte orders that placed O.M. and A.D. in the emergency temporary custody of CPSU. Doc. A1, B1.[2] The complaints filed that same day by CPSU had alleged that the children were neglected and dependent children under R.C. 2151.03(A)(2) and R.C. 2151.04(C). Doc. A2, B2. At a shelter care hearing on January 27, 2022, the trial court concluded that probable cause existed to conclude that the children were neglected and dependent. Doc. A7, B8. On February 22, 2022, Reagan filed motions to dismiss, arguing that the complaints failed to set forth a claim for relief under R.C. 2151.03(A)(2) or R.C. 2151.04(C). Doc. A19, B20.

{¶10} On March 17 and 21, 2022, the trial court held adjudicatory hearings in these cases. Doc. A32, B27. The trial court denied Reagan's motions to dismiss at the adjudicatory hearing on March 17, 2022. Tr. 16, 123. On March 21, 2022, the trial court filed judgment entries in which it found, by clear and convincing evidence, that A.D. and O.M. were neglected and dependent children. Doc. A32, B27. The trial court's factual findings in its judgment entries mirror the findings that the court made on the record after the hearings. On April 15, 2022, the trial court held the dispositional hearing. Doc. A34, B28. By amended judgment entries

---

[2] Case No. 2022 AND 0002 regards the custody of O.M. and will have docket numbers that are preceded by the letter "A" in this opinion. Case No. 2022 AND 0003 regards the custody of A.D. and will have docket numbers that are preceded by the letter "B" in this opinion.

filed April 26, 2022, the trial court ordered O.M. and A.D. to remain in the temporary custody of CPSU.  Doc. A36, B30.

{¶11} As the mother of both O.M. and A.D., Reagan filed her notices of appeal on May 12, 2022 in Case No. 2022-AND-0002 and in Case No. 2022-AND-0003.  Doc. A37, B31.  These cases were assigned Appeal No. 5-22-08 and Appeal No. 5-22-09 respectively.  On May 13, 2022, Cory filed his notices of appeal in Case No. 2022-AND-0002 and in Case No. 2022-AND-0003.  Doc. A42, B36.  However, Cory is only the father of A.D.  Tr. 161.  Doc. A2.  Accordingly, Cory is not a proper party to the case involving O.M. and does not have standing to challenge the judgment of the trial court in that case.  For this reason, Cory's appeal in the case concerning O.M. in Case No. 2022-AND-0002 and Appeal No. 5-22-08 is hereby dismissed.  Further, Cory submitted an improper brief to this Court in Appeal No. 5-22-09 that was stricken.  Cory was then given an opportunity to correct his filing but never submitted a proper brief.  For this reason, his appeal in Case No. 2022-AND-0003 and Appeal No. 5-22-09 is hereby dismissed pursuant to App.R. 18(C).

{¶12} In her brief, Reagan raises the following four assignments of error in Appellate Case No. 5-22-08 and Appellate Case No. 5-22-09, which were consolidated for briefing and review.  Here are the four assignments of error raised:

**First Assignment of Error**

**The trial court abused its discretion by failing to dismiss the complaints for failure to state a claim for relief under R.C. 2151.03(A)(2) or R.C. 2151.04(C).**

**Second Assignment of Error**

**The trial court's findings of neglect and dependency were against the manifest weight of the evidence after the Agency failed to present any evidence, let alone clear and convincing evidence, that the children were neglected or dependent.**

**Third Assignment of Error**

**The trial court committed reversible error when it failed to properly interpret and apply the Ohio rules of juvenile procedure and the Ohio rules of evidence during the adjudication hearing.**

**Fourth Assignment of Error**

**The trial court abused its discretion when it found that the Agency had used reasonable efforts to prevent the continued removal of the children from their home.**

{¶13} In the first assignment of error, Reagan argues that the trial court abused its discretion in not dismissing CPSU's complaints for neglect and dependency. Specifically, Reagan argues that the complaints failed to allege any facts to support the statutory factors for a finding of neglect or dependency.

{¶14} R.C. 2151.27(A)(1), governing the requirements for filing a complaint in juvenile court, provides, in relevant part, that the complaint "shall allege the particular facts upon which the allegation that the child * * * is [a] * * * neglected,

or dependent child is based." Further, Juv.R. 10(B), governing the general form of juvenile complaints, provides, in relevant part, that the complaint shall "[s]tate in ordinary and concise language the essential facts that bring the proceeding within the jurisdiction of the court[.]" Juv.R. 10(B)(1). "Ohio Appellate Courts have held that '[t]he basis of R.C. 2151.27(A)(1) and Juv.R. 10(B)(1) is twofold. " ' "First, in an action involving the possible severance of custody rights, a respondent to such a complaint is entitled to be apprised of the basis of the state's claim in order to properly prepare a defense. * * * Second, the juvenile court * * * must be able to ascertain at an early state of the proceeding whether or not it has jurisdiction over the subject matter of the claim.' " ' " *In re L.H.*, 3d Dist. Defiance No. 4-19-14, 2020-Ohio-718, ¶ 21, quoting *In re D.P.*, 10th Dist. Franklin Nos. 12AP-557, 12AP-655, and 12AP-558, 2013-Ohio-177, ¶ 12, quoting *In re Johnson*, 10th Dist. Franklin No. 00AP691 (Mar. 22, 2001), quoting *In re Sims*, 13 Ohio App.3d 37, 42-43 (12th Dist. 1983).

{¶15} The denial of a pretrial motion to dismiss a complaint, made under Juv.R. 22(D), is within the trial court's discretion and will not be reversed on appeal unless the trial court has abused its discretion. *In re L.S.*, 3d Dist. Union Nos. 14-15-05 and 14-15-06, 2016-Ohio-4999, ¶ 10. "An abuse of discretion suggests that the trial court's decision is unreasonable, arbitrary, or unconscionable." *Id.* citing *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).

{¶16} CPSU filed its complaints alleging that the children were neglected as defined in R.C. 2151.03 and that the children were dependent as defined in R.C. 2151.04. Doc. A2, B2. More specifically, CPSU cited R.C. 2151.03(A)(2) which defines a neglected child as one "[w]ho lacks adequate parental care because of the faults or habits of the child's parents * * *." R.C. 2151.04(C) was cited which defines a dependent child as one "[w]hose condition or environment is such as to warrant the state, in the interests of the child, in assuming the child's guardianship[.]"

{¶17} After setting forth the definitional statutory language, CPSU's complaints for neglect and dependency stated in pertinent part the following "particular facts": CPSU became involved after receiving a report with concerns of a domestic violence incidence that took place in the home on November 22, 2021, where Reagan was transported to the hospital to address her injuries and Cory was arrested, and the children went with two different grandparents determined by Reagan and law enforcement; the fact that the caseworker explained to Reagan that Cory was not to be in the home or have unsupervised contact with the children until they both engaged in services and CPSU determined it was appropriate; a history of a prior domestic violence incident from January of 2021 where Cory was also arrested for stabbing knives in the bathroom door; the fact that Reagan reported there have been many arguments since that incident and that she stated she felt they

continued to escalate and had fears they would turn violent; the fact that Reagan reported she had severe concerns for her own mental health; the fact that Reagan initially denied having Cory in the home, but then admitted he had stayed two nights at Christmastime; the fact that an after-hours welfare check was completed on January 18, 2022 where it was discovered that Cory was in the home.

{¶18} After reviewing the record, we conclude that CPSU's complaints adequately set forth the particular facts upon which the allegations are based and therefore complied with the requirements of Juv.R. 10(B)(1) and R.C. 2151.27(A)(1). As this Court has previously stated, "one of the principal reasons for stating the factual allegations in a complaint is to apprise the defendant of the potential issues that she may be facing." *In re L.H.*, 3d Dist. Defiance No. 4-19-14, 2020-Ohio-718, at ¶ 25, citing *see In re D.P.* at ¶ 12. Therefore, given the specific facts alleged, including the domestic violence incidents identified in the complaints filed in this matter, and the fact that dismissal would result in the children being returned to a potentially dangerous environment, we cannot find that it was unreasonable, arbitrary, or unconscionable for the trial court to deny Reagan's motions to dismiss the complaints.

{¶19} Based on the foregoing, we overrule Reagan's first assignment of error. We address the remaining assignments of error out of order.

*Third Assignment of Error*

**{¶20}** In her third assignment of error, Reagan argues that the trial court erred in failing to comply with the Ohio Rules of Juvenile Procedure during the adjudication hearing.

**{¶21}** To support her argument, Reagan contends her counsel brought to the attention of the trial court at the time of the adjudication hearing that a list of witnesses had not been disclosed as part of the discovery provided from the State. However, Reagan acknowledges in her brief that the trial court attempted to address such deficiency in the granting of a continuance, and, for this reason, withdrew her objection to not having been provided a witness list. (Appellant's Brief at p. 25). Thus, the record shows that the trial court attempted to properly address such defect in the granting of a continuance as allowed by Juv.R. 24(C). "If at any time during the course of the proceedings it is brought to the attention of the court that a person has failed to comply with an order issued pursuant to this rule, the court may grant a continuance, prohibit the person from introducing in evidence the material not disclosed, or enter such other order as it deems just under the circumstances." Juv.R. 24(C). Further, we note that Reagan's concern over the time frame for the adjudication was misplaced because at the time of the continuance, the sixty-day time period of Juv.R. 29 for holding the adjudicatory hearing was not reached as the complaints were filed on January 26, 2022 and the hearing was March 17, 2022, fifty days later.

{¶22} We conclude that Reagan waived any error regarding the production of a witness list by withdrawing her objection at the time of the adjudication hearing, and there is no evidence to support her claim that she was forced to waive that deficiency in discovery and proceed without the prior disclosure of witnesses. *See generally State v. Lawson*, 64 Ohio St.3d 336, 340, 1992-Ohio-47 (error could be considered waived by withdrawing objection). As such, her argument is not well-taken.

{¶23} Reagan's second argument is that the trial court also committed reversible error when it failed to properly interpret and apply the Ohio Rules of Evidence during the adjudication hearing. "Adjudicatory hearings require strict adherence to the Rules of Evidence." *In re S.L.*, 3d Dist. Union Nos. 14-15-07 and 14-15-08, 2016-Ohio-5000, ¶ 23, citations omitted. Additionally, we recognize that the trial court has broad discretion concerning the admissibility of evidence. *Id.* at ¶ 24. " 'A decision to admit or exclude evidence will be upheld absent an abuse of discretion.' " *Id.* quoting *Beard v. Meridia Huron Hosp.*, 106 Ohio St.3d 237, 2005-Ohio-4787, ¶ 20. " 'Even in the event of an abuse of discretion, a judgment will not be disturbed unless the abuse affected the substantial rights of the adverse party or is inconsistent with substantial justice.' " *Id.* quoting *Beard* at ¶ 20. *See* Evid.R. 103(A) ("Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected[.]").

**{¶24}** Reagan asserts specifically that Patrolman Stoner, who responded to the November incident, was allowed to provide testimony, over Reagan's counsel's objection, about other information that did not pertain to the children as such information was not relevant. " 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Evid.R. 401. However, we agree with CPSU that the testimony was relevant to the adjudication as the parents' actions and the conditions or surroundings of the children were within the range of the testimony that Patrolman Stoner had provided and was relevant for the trial court to decide as to whether or not the children were neglected and dependent children.

**{¶25}** Reagan also asserts that testimony from Miller was inadmissible hearsay with respect to statements made to her by Cory and as to information contained in other incident reports other than the November incident. According to Miller's testimony, Reagan had disclosed the same information that she had taken from the report of the bathroom incident. This Court would again conclude that such testimony was relevant as it went to the conditions surrounding the household the children were in during the history of CPSU's involvement with the family, which is certainly relevant to the proceedings.

{¶26} Lastly, Reagan raises a challenge to questioning concerning her childhood and its relevancy to whether the children were neglected or dependent. The record reflects that the questioning was brief. The testimony was that she grew up in a home with domestic violence and that she always "put off any sort of arguing until the kids are not present, whether that be them asleep or with somebody else. If we have issues, we make sure to discuss them by ourselves with no one else around." Tr. 225-227. "The issue of whether testimony is relevant or irrelevant is best decided by the trial judge, who is in a significantly better position to analyze the impact of the evidence." *In re G.T.*, 5th Dist. Richland No. 2021 CA 0065, 2022-Ohio-595, ¶ 79, citing *State v. Taylor*, 39 Ohio St.3d 162 (1988). Accordingly, the "admission or exclusion of relevant evidence lies within the sound discretion of the trial court." *Id.* citing *Krischbaum v. Dillon*, 58 Ohio St.3d 58 (1991). We find the trial court did not abuse its discretion in admitting this testimony and find it relevant, particularly in the specific context of this case involving allegations about Reagan's home environment for purposes of a dependency analysis.

{¶27} For these reasons, the third assignment of error is overruled.

*Second Assignment of Error*

{¶28} In her second assignment of error, Reagan argues that the findings that the children are neglected under R.C. 2151.03(A)(2) or dependent children under R.C. 2151.04(C) are against the manifest weight of the evidence.

Legal Standard

{¶29} As outlined above, pursuant to R.C. 2151.03(A)(2), a child is neglected if the child, "lacks adequate parental care because of the faults or habits of the child's parents * * *." R.C. 2151.03(A)(2). In turn, the Revised Code defines "adequate parental care" as

> **the provision by a child's parent or parents, guardian, or custodian of adequate food, clothing, and shelter to ensure the child's health and physical safety and the provision by a child's parent or parents of specialized services warranted by the child's physical or mental needs.**

R.C. 2151.011(B)(1). R.C. 2151.03(A)(2) "requires some showing that parents, a guardian, or a custodian is at fault before a finding of a lack of proper (or adequate) care can be made." *In re Riddle*, 79 Ohio St.3d 259, 262, 1997-Ohio-391.

{¶30} As outlined above, pursuant to R.C. 2151.04(C), a dependent child is one "[w]hose condition or environment is such as to warrant the state, in the interests of the child, in assuming the child's guardianship[.]" R.C. 2151.04(C). In contrast to the analysis of whether a child is neglected, a determination of dependency focuses on the child's condition or environment, and not on the parent's fault. *In re K.J.*, 3d Dist. Hancock Nos. 5-19-31 and 5-19-32, 2020-Ohio-3918, ¶ 12, citing *In re Riddle* at 262. However, " ' " 'a court may consider a parent's conduct insofar as it forms part of the child's environment.' " ' " *In re L.H.*, 3d Dist. Defiance No. 4-19-14, 2020-Ohio-718, at ¶ 32, citing *In re C.D.D.*, 11th Dist. Portage No.

2011-P-0065, 2012-Ohio-3302, ¶ 30, quoting *State ex rel. Swanson v. Hague*, 11th Dist. No. 2009–A–0053, 2010–Ohio–4200, ¶ 24, quoting *In re Z.P.*, 5th Dist. No. 20008CA00209, 2009–Ohio–378, ¶ 17. "Moreover, 'circumstances giving rise to a legitimate risk of harm may suffice to support a dependency adjudication under R.C. 2151.04(C).' " *Id.* quoting *In re S Children*, 1st Dist. Hamilton No. C-170624, 2018-Ohio-2961, ¶ 36, citing *In re M.E.G.*, 10th Dist. Franklin Nos. 06AP-1256, 06AP-1257, 06AP-1258, 06AP-1259, 06AP-1263, 06AP-1264 and 06AP-1265, 2007-Ohio-4308, ¶ 62 (children who were not the victims of sexual abuse deemed dependent where sibling had been sexually abused by father); *In re Savchuk Children*, 180 Ohio App.3d 349, 2008-Ohio-6877 (11th Dist.), ¶ 59, (infant's multiple and severe injuries that parents could not explain were sufficient to support a dependency finding as to unharmed siblings under R.C. 2151.04(C)); *In re A.P.*, 12th Dist. Butler No. CA2005-10-425, 2006-Ohio-2717 (dependency adjudication upheld where father had stabbed his live-in fiancée while A.P. was asleep in the other room, and where a 14-year-old had been left in charge for several hours after the stabbing); *In re C.T.*, 6th Dist. Sandusky No. S-18-005, 2018-Ohio-3823, ¶ 61 (mother's drug use, failure to address substance abuse, and overdose created an environment that was not appropriate for minor child.).

{¶31} If a trial court at an "adjudicatory hearing finds from clear and convincing evidence that the child is an abused, neglected, or dependent child, the

court shall proceed * * * to hold a dispositional hearing and hear the evidence as to the proper disposition to be made under * * * [R.C.] 2151.353 * * *." R.C. 2151.35(A)(1). In turn, R.C. 2151.353(A)(2) gives the trial court the authority to "[c]ommit the child to the temporary custody of * * * [a] public children services agency" once the child has been "adjudicated an abused, neglected, or dependent child * * *." R.C. 2151.353(A)(2)(a).

{¶32} When this Court reviews a trial court's adjudication of a child as abused, neglected or dependent to determine whether the judgment is supported by clear and convincing evidence, we must determine whether the trier of fact had sufficient evidence before it to satisfy the clear-and-convincing-evidence degree of proof. *In re S.L.*, 3d Dist. Union Nos. 14-15-07 and 14-15-08, 2016-Ohio-5000, at ¶ 11; *In re Z.S.*, 3d Dist. Defiance Nos. 4-09-20, 4-09-21, 4-09-22, 4-09-23, 4-09-24, and 4-09-25, 2010-Ohio-1929, ¶ 23. Clear and convincing evidence is that which produces " 'in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established.' " *In re Adoption of Holcomb*, 18 Ohio St.3d 361, 368 (1985), quoting *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus.

## Legal Analysis

{¶33} We consider first whether clear and convincing evidence establishes that O.M. and A.D. were neglected children within the meaning of R.C.

2151.03(A)(2). CPSU's cases mainly rest on pointing to four altercations between Reagan and Cory. The family came to the attention of CPSU in June of 2020, when it received a report with allegations of domestic violence in the home that resulted in Reagan pleading guilty to a charge of disorderly conduct. Tr. 75. There was a no-contact order at that time as well. *Id.* Then, in January of 2021, CPSU was involved in a case with the family again for domestic violence in the home. *Id.* On that particular day in January, Reagan reported that she was "struggling greatly with her mental health," and at that time a physical altercation took place during which Cory stabbed a bathroom door with a knife while Reagan was inside. *Id.* That case was substantiated for neglect. *Id.* Services were referred to the family by CPSU to engage in Open Arms services, mental health services, and at that time there was a "CPO" also involved. Tr. at 76. Although Reagan completed domestic violence classes and was engaged in mental health services, Cory did not engage in any of those services. *Id.*

{¶34} In October of 2021, there was another incident where Reagan and Cory had an argument in the home. Tr. at 87. Cory was told to leave; however, when he got in the vehicle to do so, Reagan ran out into the driveway. *Id.* They were fighting in the driveway during which she grabbed the car door as he tried to pull the vehicle out into the street and during which she was almost ran over by the front tire of the car. Tr. 87. Although Reagan testified she "didn't say * * * almost

ran me personally over," she admitted she "said that [her] foot was close to getting ran over." Tr. 175.

**{¶35}** Finally, there was the incident on November 22, 2021 ten months later after Reagan had gone through the domestic violence classes and engaged in mental health services and was actually taken to the hospital because she had significant injuries that ultimately led to the initiation of these cases. Tr. 77, 87. The police contacted CPSU because there was a question about who would watch O.M. and A.D. that night before arrangements were made for the children to go to separate grandparents' homes. Tr. 37-38.

**{¶36}** As we begin to consider these events, we note that there was testimony at the adjudicatory hearing that Miller met with Reagan on December 2, 2021 and told her that Cory should not have "access to the children that was unsupervised" and that he "was not to be in the home * * *." Tr. 70. Further, at the hearing, there was testimony that the Municipal Court had put a no contact order in place due to the November 22, 2021 incident. Tr. 212. However, despite the no contact order in place against Cory, Miller discovered during the December 30, 2021 home visit that Reagan had allowed him to be in the home for two days over Christmas. Tr. 71. Miller testified that CPSU was concerned that Cory had been allowed in the home and that it had specified "supervised access with the children due to the aggressive nature of the reports that [CPSU] had been getting." Tr. 74, 106. Miller

said she then reiterated the importance of Cory not having any unsupervised access to the children and not being in the house, which CPSU was still requiring her to do. Tr. 71-73. At this time, Reagan also informed Miller that she was going to ask the Municipal Court to lift the no contact order so that Cory could assist with childcare. When asked why this was concerning at that point, Miller testified that Reagan "wanted to allow [Cory] back into the home when no services had taken place to address the issues that had taken place on multiple occasions and continued to escalate with each new event. The concern is that these domestic violence issues always took place * * * in their home when they were alone and when the children were there." Tr. at 80. *See In re A.C.*, 6th Dist. Lucas No. L-10-1025, 2010-Ohio-4933, ¶ 55 (concluding that the decision to disregard a lawful no contact order could be the basis of a finding of neglect "so long as it has been demonstrated that the children have been adversely affected"). Moreover, Miller testified that when she had asked Reagan how things had been going since January 2021, she stated that there continued to be a great deal of arguments between her and Cory and that they continued to escalate each time there was an incident, and that she was fearful that they would escalate to violence. Tr. at 77.

**{¶37}** Reagan testified that her relationship with Cory had been volatile and that she was concerned about Cory's actions towards her. Tr. 171, 223. She stated

that she did not believe that Cory was a threat to the children and that she always "put off any sort of arguing until the kids are not present, whether that be them asleep or with somebody else. If we have issues, we make sure to discuss them by ourselves with no one else around." Tr. 208-209, 225-227. And, although Reagan testified that she and Cory had ended their relationship before Christmas of 2021, she admitted she allowed Cory to stay in her house for two nights around Christmastime contrary to the court order of no contact. Tr. 228-229. Schmits' testimony added that "[a]s long as he's [Cory's] not in the house and they're not in a relationship, [she didn't] believe that there is a threat to the children." Tr. 150.

{¶38} Additionally, notwithstanding testimony about the sufficiency or adequacy of the actual physical surroundings or conditions of the children's home environment, Miller also testified that she had ongoing concerns about the children remaining in the home "[d]ue to the physical aggression in the home, the escalated domestic violence that was taking place, and the fact that neither parent was willing to follow the recommendations of not only Children's Services, but even Municipal Court with no contact orders. It was concerning that neither parent [was] engaging in services to address the concerns and * * * kind of concerning that [Reagan] had completed all of the domestic violence classes and mental health not but ten months prior" and "she was not only in another DV, but one that was even worse than the prior." Tr. 89-91. Miller testified that CPSU was concerned that, "if he [Cory] was

to have one of these episodes when the children are around, it potentially put the children at harm." Tr. 74. Further, when asked what concerns for the children she had that caused CPSU to file the complaints in these cases, she testified that her "concern was that I had two parents that were both disclosing mental health concerns. One who was telling me he was not on medication against the wishes of his doctor. And I had both parents failing to engage in all of those services. I had both parents continuing to get together in the home with the children even though there was a no contact order not only by myself but also by Municipal Court." Tr. 102-103. The record does indicate that Reagan was able to attend two domestic violence classes before the complaints in these cases were filed. Tr. 104, 106, 203. During Reagan's testimony, she stated that she had additionally attended counseling and had been doing "med management." Tr. 203.

{¶39} After carefully reviewing the record, we conclude that the trial court had clear and convincing evidence before it to find the children were neglected. The record shows a long history of domestic violence between Reagan and Cory since before these proceedings, with two disputes resulting in CPSU dealing with them on domestic violence issues. The record further shows, as the trial court pointed out, these disputes occur while the children are in the household and while only Reagan and Cory are present to care for the children. Doc. A32, B27. The trial

court found, concerning the issue of domestic violence, Reagan has shown no capacity to protect the children from Cory. *Id.* The trial court noted Reagan allowed Cory to watch the children and stay in the home contrary to a court order of no contact. In addition, as the trial court noted, Reagan "maintains that although she acknowledged [Cory] has a propensity for violence, she does not see any danger in having him around the children." *Id.* And, in this case, the trial court did not believe "her statements that her and [Cory] would only get into disputes when the children were asleep or cared for by another person and that the ongoing domestic violence between the two parties does not affect her children." *Id.* The trial court clearly found Reagan's testimony lacked credibility, and this Court gives great deference on review to the trial court's ability to determine the credibility of the witnesses before it. *See In re Adoption of D.W.-E.H.,* 8th Dist. Cuyahoga No. 110705, 2022-Ohio-528*,* ¶ 27, citing *Seasons Coal Co. v. Cleveland*, 10 Ohio St.3d 77 (1984).

{¶40} Further, the judgment entry of disposition reveals that although no transcript was filed from the hearing on disposition, we note the trial court's reliance on additional facts that were dispositive of granting temporary custody. In particular, several additional facts are here stated:

> **One of the children has not disclosed that she was hit by [Reagan] and [Cory] and none of the services have addressed that issue to date. Despite having nearly completed the Open Arms Domestic**

> **Violence class for victims, [Reagan] still did not walk away from an altercation with [Cory] at a party.  [Cory] has yet to begin most services.**

Doc. A36, B30.

**{¶41}** We turn to considering whether clear and convincing evidence exists to adjudicate the children dependent under R.C. 2151.04(C).  To establish dependency, CPSU largely points to the altercations between Reagan and Cory, arguing that these disputes created a negative impact on the children's living environment.  As we noted previously, the record establishes that they had a volatile relationship that resulted in several physical altercations.  Thus, we will examine what testimony was presented at the adjudicatory hearing regarding whether the children's condition or environment was affected by the altercations between Reagan and Cory.  *See In re Burrell,* 58 Ohio St.2d 37, 39 (1979) (holding that, in a dependency analysis, "[t]he conduct of a parent is relevant * * * solely insofar as that parent's conduct forms a part of the environment of this child").

**{¶42}** During her testimony, Reagan stated that she grew up in a home with domestic violence.  Tr. 225-226.  While Reagan testified that the children were never present for or aware of the incidents that occurred between her and Cory, she nevertheless admitted that the children were in the home at the time of these incidents.  Tr. 171-172, 209, 219.  Reagan testified that A.D. was in the living room during the January 2021 incident where Cory stabbed the bathroom door.  Tr. 166.

Moreover, the trial court did not find her testimony that the children were never present for or aware of these episodes to be credible because it could not "imagine that to be the case when dad had a knife and was stabbing the door and then turned around right after the incident, went and picked up the child." Tr. at 244. *See In re S.L.*, 3d Dist. Union Nos. 14-15-07 and 14-15-08, 2016-Ohio-5000, at ¶ 43. (Mere disagreement over the credibility of witnesses is not a sufficient reason to reverse a judgment on manifest weight grounds.). This finding of lack of credibility is supported by the record in that it was reported by Cory that he immediately picked up A.D. off of the bathroom floor after the incident in January of 2021. Tr. at 75, 112.

{¶43} In sum, the trial court heard testimony establishing not only that both children were in the home on multiple occasions of domestic violence, but also that on the most recent occasion in November of 2021, "they were left without a parent in the home to provide care for them" and "they both had to go to separate homes to have appropriate care for the time." Tr. 89. The trial court also heard testimony that Miller expressed a belief, based on her training, that "being in the home with domestic violence is intrinsically harmful to a child's psychological and spiritual well-being." Tr. 117.

{¶44} On the entire record before us, we find clear and convincing evidence to support the trial court's finding that these children were dependent within the

meaning of R.C. 2151.04(C). "[A] long history of domestic violence between the parents can constitute the clear and convincing evidence necessary for a finding pursuant to R.C. 2151.04(C); that is, a child residing in a household where the parents' relationship is marred by domestic violence is one whose condition or environment is such as to warrant the state, in the interests of the child, to assume the child's guardianship." *In re Alexander C.*, 164 Ohio App.3d 540, 2005-Ohio-6134, ¶ 58, citing *In re Jehosephat W.*, 6th Dist. No. L-01-1505, 2002-Ohio-5503, at ¶ 17, citing R.C. 2151.04(C).

**{¶45}** In this case, the trial court's adjudication entry contains express findings of fact addressing Reagan and Cory's history of domestic violence. The trial court focused on the fact that one child was nearby and picked up by Cory after one dispute, and the children were either left alone in the home while the parents engaged in the other disputes or neither could care for the children leaving the police to locate a caregiver for the children. Doc. A32, B27. These are facts which give rise to a legitimate risk of harm in the environment of the children. *See In re Z.S.*, 3d Dist. Defiance Nos. 4-09-20, 4-09-21, 4-09-22, 4-09-23, 4-09-24, and 4-09-25, 2010-Ohio-1929, at ¶ 26 (stating that " ' "the law does not require the court to experiment with the child's welfare to see if * * * [the child] will suffer great detriment or harm." ' " citations omitted).

{¶46} Finally, we also conclude that the trial court's findings that the children were neglected and dependent are supported by the manifest weight of the evidence.

{¶47} Accordingly, the second assignment of error is overruled.

*Fourth Assignment of Error*

{¶48} In her final assignment of error, Reagan argues that the trial court erred and abused its discretion in finding CPSU made reasonable efforts to prevent the continued removal of the children from the home.

Legal Standard

{¶49} " 'We review under an abuse-of-discretion standard a trial court's finding that an agency made reasonable efforts toward reunification.' " *In re P.C.*, 3d Dist. Logan Nos. 8-20-39, 8-20-40, 8-20-41, 8-20-45, 8-20-46, and 8-20-47, 2021-Ohio-1238, ¶ 42, quoting *In re A.M.*, 3d Dist. Marion No. 9–14–46, 2015–Ohio–2740, ¶ 24, citing *In re C.F.*, 113 Ohio St.3d 73, 2007–Ohio–1104, ¶ 48 and *In re Sherman*, 3d Dist. Hancock Nos. 5–06–21, 5–06–22, and 5–06–23, 2006–Ohio–6485, ¶ 11. Again, an abuse of discretion suggests that the trial court's decision is unreasonable, arbitrary, or unconscionable. *Id.* citing *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).

{¶50} The issue in determining "reasonable efforts"—is not whether there was anything more that the agency could have done, but whether the agency's case

recommendations and efforts were reasonable and diligent under the circumstances of this case. *See In re M.H.*, 3d Dist. Allen No. 1-20-57, 2021-Ohio-3642, ¶ 45.

Legal Analysis

**{¶51}** Under R.C. 2151.419, when a trial court

> **removes a child from the child's home or continues the removal of a child from the child's home, the court shall determine whether the public children services agency * * * has made reasonable efforts to prevent the removal of the child from the child's home, to eliminate the continued removal of the child from the child's home, or to make it possible for the child to return safely home.**

R.C. 2151.419(A)(1).

**{¶52}** In this case, the trial court made its reasonable-efforts findings in its shelter care entry and amended dispositional entry. The trial court concluded in its shelter care entry that CPSU had provided reasonable efforts to avoid removal "including a safety plan and information and referrals for services." Doc. A7, B8. In addition to the trial court's reasonable-efforts finding in its dispositional entry, the trial court adopted and incorporated the CPSU's case plan filed on February 18, 2022, which identified reunification as its goal. Doc. A36, B30. Finally, the trial court noted in its dispositional entry that, while Reagan "has completed some portions of the proposed case plan * * * some concerns remain." *Id.* "The concerns indicated include * * * [Reagan] still hesitates to admit that there existed violence between her and [Cory]." *Id.* Accordingly, given the facts and circumstances

-29-

surrounding this case, we conclude that the trial court properly found, and the record reflected, that CPSU made reasonable efforts to prevent the continued removal of the children from their home and undertook reasonable efforts working with the family.

*Conclusion*

**{¶53}** Having found no error prejudicial to Appellant Reagan M. in the particulars assigned and argued in Appeal No. 5-22-08, the judgment of adjudication and the judgment of disposition of the Juvenile Division of the Hancock County Court of Common Pleas in Case No. 2022-AND-0002 is affirmed. Having found that Cory D. was not a proper party to Appeal No. 5-22-08, his appeal in this case is dismissed.

**{¶54}** Having found no error prejudicial to Appellant Reagan M. in the particulars assigned and argued in Appeal No. 5-22-09, the judgment of adjudication and the judgment of disposition of the Juvenile Division of the Hancock County Court of Common Pleas in Case No. 2022-AND-0003 is affirmed. Having found that Cory D. failed to file a proper brief in Appeal No. 5-22-09, his appeal in this case is dismissed.

*Judgments Affirmed and*
*Appeals Dismissed in Part*

**MILLER, P.J., concurs.**

**/jlr**

-30-

**WILLAMOWSKI, J., Concurring in Part and Dissenting in Part.**

{¶55} For the reasons stated by the majority, I concur in the dismissal of Cory as a party to these cases. However, I respectfully dissent from the majority opinion because, as alleged in the first assignment of error, CPSU did not file complaints that contained sufficient essential or particular factual allegations to establish the stated claims. Further, even if the complaints had provided essential or particular factual allegations that were sufficient to state the relevant claims, at the adjudicatory hearing, CPSU still did not carry the burden of establishing, by clear and convincing evidence, that O.M. and A.D. were actually neglected or dependent children as was alleged in the second assignment of error. I will examine the merits of each of these two assignments of error.

{¶56} In the first assignment of error, the appellant argues that the complaints filed by CPSU were defective. Juv.R. 22(D)(2) permits "objections based on defects in the complaint" to be raised prior to the adjudicatory hearing as was done in this case. Juv.R. 22(D)(2). Doc. A19, B20. Under Juv.R. 10(B)(1), a complaint that alleges a child is neglected or dependent must set forth "the essential facts that bring the proceeding within the jurisdiction of the court * * *." Juv.R. 10(B)(1). Similarly, R.C. 2151.27(A)(1) states that "the complaint shall allege the

particular facts upon which the allegation that the child * * * is a[] * * * neglected[] or dependent child is based." R.C. 2151.27(A)(1).

> **The basis of R.C. 2151.27(A)(1) and Juv.R. 10(B)(1) is twofold. 'First, in an action involving the possible severance of custody rights, a respondent to such a complaint is entitled to be apprised of the basis of the state's claim in order to properly prepare a defense. * * * Second, the juvenile court, being a court of limited jurisdiction, must be able to ascertain at an early state of the proceeding whether or not it has jurisdiction over the subject matter of the claim.'**

*In re D.P.*, 10th Dist. Franklin Nos. 12AP-557, 12AP-655, 12AP-558, and 12AP-558, 2013-Ohio-177, ¶ 12, quoting *In re Sims*, 13 Ohio App.3d 37, 42-43, 468 N.E.2d 111 (12th Dist. 1983).

{¶57} In these cases, CPSU filed complaints that alleged the children were neglected under R.C. 2151.03(A)(2) and dependent under R.C. 2151.04(C). Under R.C. 2151.03(A)(2), a "neglected child" is one "[w]ho lacks adequate parental care because of the faults or habits of the child's parents * * *." R.C. 2151.03(A)(2). The Ohio Revised Code defines "adequate parental care" as

> **the provision by a child's parent or parents, guardian, or custodian of adequate food, clothing, and shelter to ensure the child's health and physical safety and the provision by a child's parent or parents of specialized services warranted by the child's physical or mental needs.**

R.C. 2151.011(B)(1). The complaints detail two altercations between Cory and Reagan but do not set forth any essential or particular factual allegations that even suggest that the children did not have "adequate food, clothing, and shelter" that

-32-

"ensure[d] the child[ren]'s health and physical safety" because of any habit or fault on the part of Reagan. R.C. 2151.011(B)(1).

**{¶58}** In contrast to the complaint, the testimony at the adjudicatory hearing indicated that, after the November 2021 altercation, Reagan was going to the hospital and Cory had been arrested, leaving a question as to who would take care of the children before Reagan's departure. Tr. 37. This is why CPSU was initially contacted in these cases. Tr. 37-38. However, this issue was resolved before a CPSU worker had arrived with Reagan and the police contacting the children's grandparents. Tr. 37-38, 70. This testimony can at least provide a basis for an argument that the faults of the parents contributed to a brief situation in which the availability of a caregiver was in question. For reasons I state later in this analysis, I believe such an argument fails to establish neglect.

**{¶59}** However, the complaints fail to make factual allegations from which that situation can be clearly understood or from which that argument can be clearly raised. The complaints merely state that

> **Law enforcement was dispatched and the agency on call worker was called to the home. Originally both parents were going to be placed under arrest, however it was determined that Reagan needed medical attention to address her injuries. Reagan was transported to Blanchard Valley and Cory was arrested. The children went with two (2) different Grandparents determined by Mother and law enforcement. Upon discharge from the hospital Reagan picked up her children and returned home.**

Doc. 2A, 2B. This factual allegation does not suggest that Reagan failed to provide for her children. Rather, it contains indications that Reagan provided for the care of her children by securing the grandparents as caregivers before she left for the hospital. The allegation of neglect in these complaints is not supported by any essential or particular facts contained therein. Doc. 2A, 2B.

{¶60} Under R.C. 2151.04(C), a "dependent child" is one "whose condition or environment is such as to warrant the state, in the interests of the child, in assuming the child's guardianship[.]" R.C. 2151.04(C). While the complaints in these cases describe two altercations that occurred between Cory and Reagan, they do not draw any connection between these altercations and the children. *See In re A.C.*, 6th Dist. Lucas No. L-10-1025, 2010-Ohio-4933, ¶ 8 (noting that "the complaint highlighted * * * the causal connection between the alleged incidents of domestic violence and their alleged affect upon the children").

{¶61} After a description of the disputes between Cory and Reagan, the complaints only make two more passing references to the girls. Doc. A2, B2. First, the complaints mention that "[t]here was a daycare plan put in place where Cory would watch the girls at his mother's home where he was staying * * *." Doc. A2, B2. Thus, the complaints suggest that CPSU did not view Cory's mere presence around the girls as negatively impacting their environment because his supervised presence around them was facilitated by a daycare plan. Second, the complaints

later state that Reagan admitted to CPSU that Cory had been at her house "a very few times to see the girls." Doc. A2, B2.

{¶62} In the second identified factual allegation, the complaints merely allege that Cory was present around the girls. "The unwillingness of a mother to sever ties with a father who presents a danger to their child can present an environment requiring state intervention to protect the child." *In re D.P., supra*, at ¶ 20. However, as noted previously, CPSU apparently did not find Cory's mere presence around the girls to constitute a danger or to even have a negative effect on their environment because CPSU appears to have facilitated his presence around the girls through a daycare plan. The complaints contain additional information about Cory's shortcomings and mental health issues. But the factual allegations in the complaints would clearly indicate that CPSU did not believe these issues were such that Cory could not be present around the children or was negatively impacting their environment or safety.

{¶63} The complaints do make mention of the fact that Cory had been present at the house in spite of a no contact order having been put in place. Reagan's disregard of a no contact order is a problem, but there is no indication that it was a problem that negatively affected the condition or the environment of the children. Again, the complaints do not contain any essential or particular factual allegations that would indicate Cory's presence at the house had any negative impact on the

children's condition or environment. Thus, there is no indication that the issues between the parents had any discernible impact on the environment of the children.

{¶64} The failure of CPSU to raise sufficient allegations in its complaints in these cases is underscored by its subsequent failure to prove, by clear and convincing evidence, its claims of dependency and neglect at the adjudicatory hearing. Accordingly, the first and second assignments of error would each provide a sufficient basis to dismiss these cases.[3] For this reason, I now turn to the arguments raised in the second assignment of error which argue that CPSU failed to carry the burden of establishing, by clear and convincing evidence, that O.M. and A.D. were abused or neglected children.

{¶65} As to the determination of neglect, CPSU did not present evidence to establish that O.M. and A.D. "lack[ed] adequate parental care because of the faults or habits of the child[ren]'s parents * * *." R.C. 2151.03(A)(2). The Revised Code defines "adequate parental care" as

> **the provision by a child's parent or parents, guardian, or custodian of adequate food, clothing, and shelter to ensure the child's health and physical safety and the provision by a child's parent or parents of specialized services warranted by the child's physical or mental needs.**

R.C. 2151.011(B)(1). In turn, R.C. 2151.03(A)(2) "requires some showing that parents, a guardian, or a custodian is at fault before a finding of a lack of proper (or

---

[3] Such dismissal would be without prejudice to a further filing if CPSU should acquire further essential or particular facts as would give support to a properly pleaded complaint.

adequate) care can be made." *In re Riddle*, 79 Ohio St.3d 259, 262, 1997-Ohio-391, 680 N.E.2d 1227, 1230 (1997).

**{¶66}** At the adjudicatory hearing, Patrolman Stoner testified that the police only contacted CPSU because there was briefly a question about who would watch O.M. and A.D. that night. Tr. 37. However, this issue was resolved after Reagan had told the police that the children could stay with their grandparents. Tr. 38. *See Riddle, supra*, at 263. *See also In re A.O.*, 8th Dist. Cuyahoga No. 100619, 2014-Ohio-2277, ¶ 8. After arrangements were made for the children to go with their grandparents, a social worker arrived at the house, and the police informed her that CPSU's services were not needed, but she "continued to respond" because "she was already there * * *." Tr. 70.

**{¶67}** Next, Patrolman Huber testified that he was involved with the removal of O.M. and A.D. from their home on January 26, 2022. Tr. 125. He did not witness any concerning interactions between Reagan and her children or observe any indications that Reagan was not providing her children with adequate amounts of food or water. Tr. 129, 132. Patrolman Huber also stated that Reagan had packed toys and clothes for the children to take with them and had written a list of instructions for the children's care. Tr. 128. He testified that he had never before had a parent give a list of care instructions for the children when he had been involved in removing a child from a home. Tr. 130. During her testimony, Miller

affirmed that she had no reason to believe that Reagan "was not providing the children with adequate food, clothing, or shelter[.]" Tr. 102. She also observed that toys, clothing, and food were available for the children in the home. Tr. 102.

{¶68} Reagan then testified that she has always had the ability to provide the children with food, clothing, and housing. Tr. 163. She has never faced the prospect of eviction or been unable to pay her bills. Tr. 163. Reagan testified that O.M. and A.D. have never been in counseling, had developmental issues, or exhibited antisocial tendencies. Tr. 164. She also stated that she has made sure that the children have had proper medical care and has taken them to doctor's appointments. Tr. 208. Schmits testified that she lived around four or five blocks from Reagan's residence and has known the children for their entire lives. Tr. 137, 138. She stated that she was never aware of the children not having sufficient food, adequate clothing, or housing. Tr. 146. She also had not seen any filthy, unsanitary, or dangerous conditions in Reagan's home. Tr. 146. Schmits concluded her testimony on direct examination by stating that the children were sociable and did not appear to have any developmental delays. Tr. 148.

{¶69} CPSU's cases mainly rest on pointing to four fights between Cory and Reagan while they were in a relationship. In June of 2020, Cory and Reagan were involved in a fight that resulted in Reagan pleading guilty to a charge of disorderly conduct. Tr. 75. In January of 2021, there was an argument during which Cory hit

a bathroom door with a knife while Reagan was inside. Tr. 75. In October of 2021, Reagan and Cory had an argument in the driveway during which she grabbed the car door as he tried to pull the vehicle out into the street. Tr. 87. Finally, there was the incident on November 22, 2021 that ultimately led to the initiation of these cases. Tr. 77.

**{¶70}** In considering these events, I would note that there was no testimony at the adjudicatory hearing that the children were ever the victims of domestic violence, were ever aware of the altercations between Cory and Reagan, or ever experienced any improper discipline at the hands of Cory or Reagan. Doc. A2, B2. Tr. 111, 113, 141, 145, 150-151, 161, 171, 223. Miller did note that there had been no reports of Cory having been aggressive towards the children; engaging in any improper disciplinary activities; or getting into physical altercations with any of his other family members. Tr. 113-114. While she testified that she had observed Reagan with the children and that Reagan's interactions with them "seemed fine," Miller testified that she had never seen Cory with O.M. or A.D. Tr. 109. Reagan testified that she practices gentle parenting and described her disciplinary techniques at the hearing. Tr. 161. She also stated that Cory had never behaved violently or inappropriately towards the children. Tr. 161, 171, 195.

**{¶71}** Further, CPSU did not present any evidence to establish that the children were aware of or impacted by any of these incidents. *See In re Alexander*

*C.*, 164 Ohio App.3d 540, 2005-Ohio-6134, 843 N.E.2d 211, ¶ 53 (6th Dist.). At the adjudicatory hearing, Patrolman Stoner testified that he could not confirm that the children had been in the room or were even awake during the incident that occurred on November 22, 2021. Tr. 49, 50, 64. Miller admitted that she did not know whether the children were aware of these altercations. Tr. 108. But she then noted that Cory had reported that he had picked up the baby, A.D., immediately after the argument in January of 2021. Tr. 112. At that time, A.D. would have been roughly four months old. Tr. 160. Miller indicated that she did not know if A.D. was awake or asleep at the time Cory picked her up or if A.D. was cognizant of her surroundings. Tr. 112. Reagan later testified that A.D. was in a different room during the January 2021 incident where Cory hit the bathroom door. Tr. 166.

{¶72} CPSU states that it was concerned that Cory had been allowed in the home even though CPSU "was recommending no contact to take place between * * * Reagan and Cory and the children." Tr. 106. Miller testified that CPSU was concerned that, "*if* he [Cory] was to have one of these episodes when the children are around, it [could] *potentially* put the children at harm." (Emphasis added.) Tr. 74. This is not clear and convincing evidence in this case. It is speculative. At the hearing, Miller testified that she met with Reagan on December 2, 2021 and told her that Cory should not have "access to the children that was unsupervised" and that he "was not to be in the home * * *." Tr. 70.

**{¶73}** However, Miller stated that she did not give any instructions to Reagan in writing and that no case plan was in place because CPSU was only involved in an investigation at this point. Tr. 93. *See* Tr. 202-203. Reagan did testify that the Municipal Court had put a no contact order in place against Cory as a result of the November 22, 2021 incident against her. Tr. 202. On December 30, 2021, Miller discovered that Reagan had allowed Cory to be in the home for two days over Christmas. Tr. 71. At this time, Reagan also informed Miller that she was going to ask that the Municipal Court to lift the no contact order so that Cory could assist with childcare. Tr. 72, 168. Miller then reiterated the fact that CPSU did not want Cory in the house. Ex. D2. Reagan testified that she believed that, if the Municipal Court lifted the no contact order, Cory would be permitted to visit the children at the house. Tr. 201-202. She further testified that she had received conflicting information about whether Cory would be permitted around the children if the no contact order was lifted. Tr. 202.

**{¶74}** When asked, Miller was not able to identify any ways in which the children had been negatively impacted by Cory's presence in the home after the November 22, 2021 incident. Tr. 107. *See In re A.C.*, 6th Dist. Lucas No. L-10-1025, 2010-Ohio-4933, ¶ 55 (concluding that the decision to disregard a lawful no contact order could be the basis of a finding of neglect "so long as it has been demonstrated that the children have been adversely affected"); *In re Walling*, 1st

Dist. Hamilton No. C-050646, 2006-Ohio-810, ¶ 18 (finding that, "without evidence of some nexus between [a parent's] * * * failure to abide by the [protective] orders and resulting harm to * * * [the child], we can not [sic] presume harm").

{¶75} Reagan testified that she and Cory had ended their relationship in December of 2021 and had not had any arguments or physical altercations since November 22, 2021. Tr. 229, 231-232. She stated that her relationship with Cory had been volatile and that she was previously concerned about Cory's actions towards her. Tr. 223. However, Reagan testified that Cory had never behaved inappropriately towards the children. Tr. 171, 195. She stated that Cory had never "erupted" in front of the children; that she did not believe that Cory was a threat to the children; and that she would not let anyone around the children if she believed that person was a threat to the children. Tr. 208-209. Similarly, Schmits stated that, while she believed that Cory was a threat to Reagan as long as they were in a relationship, she did not believe that Cory had posed a risk to the children. Tr. 150.

{¶76} Miller also testified that Reagan was not engaged with the classes that had been recommended for her. Tr. 103. However, Reagan testified that she went to a session as an intake on December 2, 2021 but stated that several of the classes in December had been cancelled because the instructor had contracted Covid and that she was then unable to attend because she had contracted Covid. Tr. 204-205. She was able to attend these classes before the complaints in these cases were filed.

Tr. 203. Reagan's attorney introduced a progress report that discussed her attendance at the classes recommended by CPSU. Tr. 105-106, 203-204. Ex. A1. Reagan affirmed that she was "willing to do whatever the Court or CPS asks * * * in order to get the kids back home[.]" Tr. 210.

{¶77} At the adjudicatory hearing, CPSU did not present any evidence that O.M. or A.D. lacked adequate parental care as defined by R.C. 2151.011(B)(1). None of the witnesses at the hearing observed any indication that Reagan had failed to provide "adequate food, clothing, and shelter" for the children or gave any testimony to evidence that the children were in need of any "specialized services." R.C. 2151.011(B)(1). Accordingly, CPSU did not carry the burden of establishing by clear and convincing evidence that these children were neglected within the meaning of R.C. 2151.03(A)(2) as was alleged in the complaints. Doc. A2, B2.

{¶78} As to the allegation of dependency, CPSU did not present clear and convincing evidence that O.M. and A.D. were children "[w]hose condition or environment is such as to warrant the state, in the interests of the child, in assuming the child's guardianship[.]" R.C. 2151.04(C).[4] In a dependency analysis, "[t]he parent's conduct is significant only if it has an adverse impact on the child sufficient

---

[4] Both R.C. 2151.03(A) and R.C. 2151.04 include other factors or circumstances that would qualify a child as neglected or dependent. However, CPSU only cited R.C. 2151.03(A)(2) and R.C. 2151.04(C) as bases for removal in its complaints. Doc. A2, B2. A review of the facts in the record do not suggest that any of these other factors or circumstances are present in these cases. For this reason, I limit my written analysis to the statutory provisions that were cited by CPSU in its complaints.

to justify state intervention." *In re K.J.*, 3d Dist. Hancock Nos. 5-19-31 and 5-19-32, 2020-Ohio-3918, ¶ 12.

> **And '[a]s a part of the child's environment such conduct is only significant if it can be demonstrated to have an adverse impact upon the child sufficiently to warrant state intervention. That impact cannot simply be left to inference, but must be specifically demonstrated in a clear and convincing manner.' *Id.***

*In re M.R.*, 1st Dist. Hamilton No. C-190547, 2020-Ohio-3648, ¶ 24, quoting *In re Burrell*, 58 Ohio St.2d 37, 39, 388 N.E.2d 738 (1979).

> **In the absence of evidence showing a detrimental impact upon the child of the relationship established as here existing, that relationship, as a part of the child's environment does not warrant the state in removing the child from parental custody in the best interest of that child.**

*In re Holzwart*, 3d Dist. Seneca Nos. 13-04-32, 13-04-33, 13-04-34, and 13-04-40, 2005-Ohio-1602, ¶ 10, quoting *Burrell* at 39. Further,

> **[t]o find a child dependent merely because the relationship between the parents is unhealthy or erratic would find many children of divorcing parents also being labeled as dependent. There must be some nexus between the parents' relationship and the environmental impact on the child.**

*In re G.C-O.*, 3d Dist. Seneca No. 13-12-56, 2013-Ohio-4974, ¶ 11. A trial court cannot "merely infer[] what could happen." *Id.* Unfortunately, that appears to be what has happened in this case.

{¶79} At the hearing, there was testimony about the general condition of the children and of Reagan's home. While Miller was testifying, Reagan's attorney

noted that, after notifying Reagan that CPSU was going to seek removal of the children from the home, CPSU waited an entire week to file complaints. Tr. 100. In explaining this delay, Miller indicated that she "didn't feel that the home conditions were dangerous" or that "the house was hazardous." Tr. 101, 102.

{¶80} Patrolman Stoner testified that he did not observe any dangerous conditions in the home or any other "real big red flags." Tr. 52. He then stated that, he "didn't see anything that, if [he] * * * would have been there [in the house] for anything else, that would have stood out to [him] * * * that the children shouldn't be there." Tr. 53. Further, he testified that his police report made no mention of any apparent issues with the health of the children or the condition of the home. Tr. 56-58.

{¶81} Patrolman Stoner testified that he had previously been involved in other cases where children were removed from a household. Tr. 50. He stated that, in those other situations, he noticed "cleanliness issues * * * with animal feces and * * * old, rotten food out" when he entered the child's house. Tr. 51. But in the cases involving O.M. and A.D., Patrolman Stoner affirmed that he made no observations "that would indicate * * * that the children did not have enough food, clothes, or appropriate shelter * * *[.]" Tr. 52.

{¶82} Similarly, Patrolman Huber testified that the house did not appear dilapidated from the outside. Tr. 126. He stated that, once inside, he observed that

the home was sufficiently heated; that the children had a number of toys; and that the children were appropriately clothed. Tr. 128, 131-132. Patrolman Huber did not observe any indications that the children did not have their hygiene tended to or that any conditions of the house that were deplorable. Tr. 129.

{¶83} To establish dependency, CPSU mainly points to four identified altercations between Reagan and Cory that occurred in 2020 and 2021, arguing that these disputes might possibly negatively impact the children's environment. At the outset, I would note that A.D. appears to have been born after the first incident between Cory and Reagan had occurred. A.D. was then roughly four months old at the time of the second incident in January of 2021 and was no more than fourteen months by the time of the fourth incident in November of 2021. O.M. was less than two years old at the time of the first incident and less than three years old at the time of the fourth incident. Thus, the children do not appear to have been old enough to furnish firsthand accounts of what they might possibly have perceived during the time that Cory and Reagan were in a relationship or whether they even had the slightest awareness of the dynamic between Cory and Reagan. In the absence of such information, CPSU is still require to provide clear and convincing evidence that the children's condition or environment were negatively impacted by the altercations between Cory and Reagan.

{¶84} As noted previously, the record establishes that, while Reagan and Cory were dating, they had a sometimes negative relationship that resulted in several physical altercations. A proper dependency analysis requires consideration of what testimony CPSU actually presented at the adjudicatory hearing regarding whether the children's condition or environment was negatively affected by the altercations between Reagan and Cory. *See Burrell, supra*, at 39 (holding that, in a dependency analysis, "[t]he conduct of a parent is relevant * * * solely insofar as that parent's conduct forms a part of the environment of this child").

{¶85} During his testimony, Patrolman Stoner stated that he did not know whether the children were present for or awake during the incident that occurred on November 22, 2021. Tr. 49, 50, 64. He also did not know if they could see or hear the fight. Tr. 64. For this reason, Patrolman Stoner affirmed that, in this case, "it's just a *possibility*" that the children were aware of and, therefore, traumatized by the fight between Cory and Reagan. (Emphasis added.) Tr. 64-65. He also stated that he could not confirm whether this incident "actually had any impact on the children * * *." Tr. 64. *See In re Z.P.*, 5th Dist. Stark No. 2008CA00209, 2009-Ohio-378, ¶ 20 (finding children's services did not establish dependency where a parent "admitted to an incident of domestic violence and drug * * * use," but there was no evidence these activities occurred in the presence of the children or impacted their environment).

{¶86} During her testimony, Miller admitted that she did not know how or even if the children had perceived these fights. Tr. 107-108. *In re G.C-O., supra*, at ¶ 11 (considering the fact that "[t]here was no testimony that * * * [the child] was aware of the dysfunctional relationship" between the parents in a dependency analysis). *See In re Alexander C., supra*, at ¶ 58 (finding dependency was not proven where "a very general, single statement, with no testimony in elaboration," established that the children had been present in the home during incidents of domestic violence between the parents). But she affirmed her personal belief that "being in the home with domestic violence is intrinsically harmful to a child's psychological and spiritual well-being[.]" Tr. 117. She also affirmed her personal belief "that a child could be traumatized by something that they don't know they heard while they were sleeping" and that "it * * * [was] possible that the effects of the trauma might not be seen until later in life[.]" Tr. 116-117. The questioning at this hearing did not elucidate a basis for this personal opinion. An opinion without foundation is merely speculation.

{¶87} Further, Miller indicated that she has not actually seen any of the potential effects of being in a home with domestic violence present in the children. Tr. 95-96, 119. *See In re M.R., supra*, at ¶ 25 (finding that a court could not "presume harm" in the absence of "evidence of some nexus between [the mother's] action and resulting harm to the children" where the mother had been "charged with

domestic violence and had violated a TPO * * *.").  She further admitted that she had not observed any negative impacts or behaviors that came "specifically only from domestic violence."  Tr. 119.  She then said, "There are things that could *potentially* be from witnessing domestic violence, but I can't say that for sure that's the only cause of those behaviors * * *."  (Emphasis added.)  Tr. 119.

{¶88} Miller also stated that she had no knowledge of any mental health assessments that had been performed on the children.  Tr. 101.  *In re Holzwart*, *supra*, at ¶ 11 (considering the fact that no testimony was offered by someone "qualified to make a determination as to whether the girls were emotionally harmed").  Thus, CPSU could not obtain firsthand information from the children about what they had perceived, if anything, or if they had been in any way negatively impacted by these incidents because of their ages.  CPSU was not able to offer any testimony from others that the children were physically present for and consciously aware of any incident between Cory and Reagan.  But beyond this, CPSU did not present any testimony from a qualified person with the technical expertise to assess whether the mental health of these had been in some way impacted by the relationship of the parents.  There is a clear "lack of details regarding the environment to which the children in this case were exposed and regarding any adverse impact the environment might have had upon the children * * *."  *Alexander C.*, *supra*, at ¶ 60.

{¶89} While the trial court did not find Reagan's testimony to be generally credible, CPSU, with the burden of proof, did not present any evidence that establishes that the children were aware of or affected by the incidents between Reagan and Cory. Reagan's testimony at the hearing did not provide any evidence that the children were aware of or affected by these incidents. She testified that she grew up in a home with domestic violence and that she always "put off any sort of arguing until the kids are not present, whether that be them asleep or with somebody else. If we have issues, we make sure to discuss them by ourselves with no one else around." Tr. 225-226. *See In re A.V.*, 12th Dist. Warren Nos. CA2021-04-030, CA2021-04-031, CA2021-04-032, and CA2021-04-033, 2021-Ohio-3873, ¶ 30, citing *In re R.S.*, 9th Dist. Summit No. 21177, 2003-Ohio-1594, ¶ 18. Reagan testified that the children were never present for or aware of the incidents that occurred between her and Cory. Tr. 171-172, 209, 219. Even if the trial court did not believe her testimony, such lack of belief by the trial court does not prove by clear and convincing evidence that the children, even if present, were negatively affected.

{¶90} To establish dependency, CPSU was "required to present evidence of conditions or environmental elements that were adverse to the normal development of the children." *In re A.C.*, at ¶ 59. The evidence offered by CPSU did not establish that the condition or environment of the children had been negatively impacted by

the incidents that occurred between Reagan and Cory. Further, CPSU did not present any evidence that establishes a nexus between the parents' altercations and any adverse impact on the environment of the children. *In re G.C-O., supra*, at ¶ 11. Thus, if there was evidence that the children were dependent, CPSU did not present it at the adjudicatory hearing. Accordingly, CPSU did not carry the burden of demonstrating by clear and convincing evidence that O.M. and A.D. are dependent children within the meaning of R.C. 2151.04(C) as alleged in the complaints. Doc. A2, B2.

**{¶91}** In conclusion, I concur in part because I agree with the majority's conclusion that Cory should be dismissed as a party from these appeals. However, I dissent in part because I would reverse the judgments of the trial court on the basis of the arguments raised in the first and then the second assignments of error. I would then decline to render an opinion as to the remaining assignments of error as they would be moot.

**/jlr**